**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

DEVIN CUSHER,

                                    Plaintiff,                    1:16-cv-01273 (BKS/DJS)

v.

ASGHAR FAROOQ MALLICK, MIKKI JUDGE,
MELISSA MORENO, ANTHONY LUCKY, and
THE NEW YORK STATE OFFICE OF CHILDREN
AND FAMILY SERVICES,

                                    Defendants.

_____

**Appearances:**

_For Plaintiff:_
Drita Nicaj
Law Offices of Drita Nicaj
272 Mill Street
Poughkeepsie, NY 12601

_For Defendants:_
Letitia James
Attorney General of the State of New York
Lynn Knapp Blake
Assistant Attorney General
The Capitol
Albany, NY 12224

**Hon. Brenda K. Sannes, United States District Judge:**

## MEMORANDUM-DECISION AND ORDER

## I.    INTRODUCTION

Plaintiff Devin Cusher brings this action against Defendants Asghar Farooq Mallick,

Mikki Judge, Melissa Moreno, Anthony Lucky, and the New York State Office of Children and

Family Services ("OCFS") ("Defendants"), alleging claims under Title VII of the Civil Rights

Act of 1964, 42 U.S.C. § 2000e _et seq._; 42 U.S.C. § 1983; New York State Executive Law § 296,

*et seq*. ("NYSHRL"); and state "whistleblower statutes." (Dkt. No. 1). Specifically, Plaintiff

alleges: (1) Title VII claims against OCFS for gender discrimination and retaliation (First and

Second Claims), (2) § 1983 claims against Mallick, Judge, Moreno, and Lucky ("Individual

Defendants") for gender discrimination and retaliation, in violation of the Fourteenth

Amendment (Third Claim),[1] (3) NYSHRL claims against all Defendants for gender

discrimination and retaliation (Fifth and Six Claims), and (4) state "whistleblower" claims

against all Defendants (Seventh Claim). (*Id*.). Defendants move for summary judgment under

Rule 56 of the Federal Rules of Civil Procedure, (Dkt. No. 62), which Plaintiff opposes. (Dkt.

No. 72). For the reasons below, the motion is granted in part and denied in part.

## II.    FACTS[2]

### A.    Highland Operations

Plaintiff was hired by OCFS in February 1994 and has worked at the Highland

Residential Center ("Highland") as a Youth Counselor 2 ("YC2") since 2007. (Dkt. No. 71-2,

¶ 3; Dkt. No 62-3, at 24). Highland is a "limited secure residential center for post-adjudicated

youth placed with OCFS by family courts." (Dkt. No. 62-6, ¶ 9). The highest-level supervisor on

site at Highland is the Facility Director. (*Id*. ¶ 46). There are four Assistant Directors, who report

directly to the Facility Director. (*Id*. ¶ 49). Among other things, Assistant Directors supervise

YC2s and complete their "performance evaluations, six month certifications, and Corrective

Action Plans" and "monitor the time and attendance of said YC2's, as well as their use of sick,

personal, and annual leave." (*Id*. ¶ 50). YC2s supervise Youth Counselor 1s ("YC1"). (*Id*. ¶ 56).

---

[1] Plaintiff also alleged that Defendants infringed his right to freedom of association in violation of the First Amendment (Fourth Claim), but has since withdrawn that claim. (Dkt. No. 72, at 45 n.9).

[2] The facts have been drawn from Defendants' statement of material facts, (Dkt. No. 62-1), Plaintiff's response and counterstatement of material facts, (Dkt. Nos. 70, 72), and the attached exhibits, depositions, and declarations. The facts are taken in the light most favorable to Plaintiff.

If a YC1 needs "time off or a work schedule adjustment," this request is either approved by their supervising YC2 (if present) or the Assistant Director in their chain of command. (*Id.*).

Mallick was the Facility Director from May 2002 until July 2015 and supervised Plaintiff from May 2010 until October 2010. (*Id.* ¶¶ 5, 29). Plaintiff was then supervised by Assistant Director Judge from September 2011 until June 2012, Assistant Director Moreno from July 2013 until December 2015, and Assistant Director Lucky from January 2016 until May 2016. (Dkt. No. 62-8, ¶ 7; Dkt. No. 62-10, ¶¶ 12, 127; Dkt. No. 62-12, ¶ 9). After Mallick was promoted in 2015, Judge took over as Facility Director. (Dkt. No. 62-8, ¶ 4).

In addition to overseeing YC1s, Plaintiff's role as a YC2 includes "supervising either a unit or multiple units . . . overseeing the program, and . . . overall daily functioning of the unit." (Dkt. No. 62-3, at 25–26). Additionally, YC2s work shifts as the Administrator on Duty ("AOD"), who is in charge of the "daily operation of the facility." (Dkt. No. 62-6, ¶ 24). There is only one AOD per shift. (*Id.*). Previously, both YC1s and YC2s served as AODs. (*Id.* ¶ 19). In 2014, the administrative team at Highland implemented a new policy allowing only YC2s to be scheduled as AODs. (*Id.* ¶ 44). A "new AOD schedule [was] established, and in January 2014, all YC2's on the AOD rotation bid for his[3] schedule based on seniority." (*Id.* ¶ 14). At the time of the shift bid, Plaintiff had the least seniority of the relevant YC2s. (*Id.* ¶ 16). YC1s still served as AODs "in the event there [was] an unscheduled absence." (Dkt. No. 71-2, ¶ 140). At some point after June 2014, YC1s were allowed to serve as AODs again.[4]

---

[3] All relevant YC2s were male. (Dkt. No. 62-6, ¶ 15).

[4] Plaintiff asserts that the 2014 policy change lasted only "a couple of months." (Dkt. No. 71-2, ¶ 143). The evidence in the record supports that there were at least two shift bids where only YC2s were scheduled as AODs, in January 2014 and June 2014 (Dkt. No. 62-6, ¶ 14; Dkt. No. 62-10, ¶ 31). Currently, Plaintiff asserts that "all three tour AODs are YC1 . . . YC1s consistently serve as the AODs." (Dkt. No. 71-2, ¶ 97). Considering the evidence in the light most favorable to Plaintiff, the Court assumes that the policy of only scheduling YC2s as AODs ceased at some point after June 2014.

Employees at Highland can be "granted temporary adjustments to their assigned work schedules" for "a variety of reasons including the need to attend to personal and/or family matters, including by not limited to childcare" at their supervisor's discretion. (Dkt. No. 62-6, ¶ 27). Supervisors consider several factors, including "the needs of the facility and the employee's time and attendance." (*Id*.)

### 1. Employee Discipline

Supervisors at Highland are expected to "hold their staff members accountable under the governing policies and rules and to take appropriate action when said policies and/or rules are not followed." (Dkt. No. 62-6, ¶ 61). When an issue arises, supervisors have the discretion to issue counseling memos. (*Id*.). Additionally, supervisors may implement a Corrective Action Plan ("CAP") and conduct "follow-up meetings . . . to monitor the employee's progress and to see if there is improvement." (*Id*.).

When an employee has "time and attendance problems," OCFS "has a three step progressive process," (*Id*. ¶ 62), including "informal counseling," "formal counseling," "requiring the employee to provide documentation for any further unscheduled absence," and "disciplinary action." (*Id*.). When there is employee misconduct, the Facility Director or a supervisor "initiates an inquiry and assigns a staff member to conduct an investigation into the occurrence." (*Id*. ¶ 63). The Facility Director then reviews the investigation and recommends discipline (where appropriate), which can include a specific recommended penalty. (*Id*. ¶ 64; Dkt. No. 71-1, at 617–18). OCFS Labor Relations then decides what disciplinary action is appropriate, and the Facility Director signs and serves a Notice of Discipline ("NOD") on the employee. (Dkt. No. 62-6, ¶ 66).

## 2. Co-Workers

Plaintiff alleges that "Highland's female employees, who are mothers, are routinely accommodated in connection with the hours worked in order to care for their children." (Dkt. No. 71-2, ¶ 12). Specifically, Plaintiff alleges that Defendants Judge and Moreno were given accommodations. (Dkt. No. 62-3, at 75). He also alleges that other co-workers, including Gail Babcock, Kelly Hicks, Mary Pazienza,[5] Nicole Romano,[6] and Katy Carson were also given accommodations. (*Id*. at 205, 283–84). During the time period in question, Gail Babcock was a Youth Division Aide ("YDA"),[7] Kelly Hicks was a YC1 and then a Youth Recreation Specialist 3,[8] Mary Pazienza was a unit clinician,[9] Nicole Romano was a unit clinician,[10] and while the record is somewhat unclear, Katy Carson appears to have been an Assistant Director.[11] Gail Babcock does not have children, (Dkt. No. 62-21, ¶ 4), and Mary Pazienza did not have childcare needs when she worked at Highland because her children were adults. (Dkt. No. 62-22, ¶ 4).

Plaintiff recalled an incident in 2014 when there was a snowstorm and he arrived late to work because his son's daycare was closed. (Dkt. No. 62-3, at 285). When he arrived, Mallick told him that he needed to get there earlier "when it snows." (*Id*.). Plaintiff testified he "noticed over time, that during snowstorms . . . they did not make an issue with female staff who called out when their kids' school and/or day care was canceled." (*Id*. at 285–86).

---

[5] Plaintiff identified "Mary Dardani" as having received accommodations. (Dkt. No. 62-3, at 284). However, Defendants submitted an affidavit by Mary Pazienza. (Dkt. No. 62-22). Defendants contend this is the same person. (Dkt. 62-1, ¶ 235). The Court assumes this to be true because Plaintiff failed to dispute this fact. (Dkt. No. 70, ¶ 235).

[6] Plaintiff identified "Nicole Cephas" as having received accommodations. (Dkt. No. 62-3, at 283). According to her affidavit, she now goes by Nicole Romano. (Dkt. No. 62-23, at 1).

[7] (Dkt. No. 62-21, ¶ 2).

[8] (Dkt. No. 62-20, ¶¶ 2, 11).

[9] (Dkt. No. 62-22, ¶ 2).

[10] (Dkt. No. 62-23, ¶¶ 1–2).

[11] (Dkt. No. 71-1, at 242, 262, 591).

### B. Work-Related Issues

#### 1. 2010-2013

##### a. Plaintiff's Paternity Leave

In 2010, Plaintiff's spouse was pregnant. (Dkt. No. 62-3, at 47–48). Plaintiff requested six weeks of paternity leave from Mallick. (*Id*. at 48). Mallick expressed "his displeasure that [Plaintiff] was taking paternity leave" and "told [Plaintiff] women – not men should be taking" parental leave. (Dkt. No. 71-2, ¶ 7). Mallick granted Plaintiff's request, and Plaintiff was on leave from August 23, 2010 until October 4, 2010. (Dkt. No. 62-6, ¶ 30). Mallick "repeatedly pressured [Plaintiff] to end [the paternity leave] early." (Dkt. No. 1, ¶ 11). Prior to taking the leave, Mallick "said he needed [Plaintiff] back before the six weeks" and twice called Plaintiff and "told [him] he needed [him back]." (Dkt. No. 62-3, at 48–49). Plaintiff came into work on one occasion during his leave. (Dkt. No. 62-7, at 4–5).

While Plaintiff was on leave, Mallick "supervised the time and attendance of the staff that [Plaintiff] supervised and discovered several problems." (Dkt. No. 62-6, ¶ 32). He issued three counseling memos to Plaintiff during his leave about (1) "staff under his supervision not properly documenting their time worked," (*id*. ¶ 35; Dkt. No. 62-7, at 13), (2) "his failure to timely complete performance evaluations and six month re-certifications for employees under his supervision," (Dkt. No. 62-6, ¶ 36; Dkt. No. 62-7, at 15), and (3) "his failure to counsel or discipline staff for time and attendance issues." (Dkt No. 62-6, ¶ 37; Dkt. No. 62-7, at 17).

##### b. Plaintiff's Schedule and Work Performance

Once Plaintiff returned from paternity leave, he worked two late night and three day shifts, which was the "practice for YC2s" at Highland during that time. (Dkt. No. 62-3, at 70). As his supervisor, Judge approved several schedule adjustments for Plaintiff between October 2011 and February 2012. (Dkt. No. 62-8, ¶¶ 16–23). When Moreno became his supervisor, she

approved Plaintiff's request to leave the facility for an hour each day to walk his dog. (Dkt. No. 62-10, ¶ 20; Dkt. No. 62-3, at 160–61).

In 2012, Mallick received an email from a YC2, who "expressed his feeling that Plaintiff should be removed from the schedule because the AOD's could not depend upon him to be at work." (Dkt. No. 62-6, ¶ 25; Dkt. No. 62-7, at 2)

In Plaintiff's 2011-2012 evaluation, Judge wrote that Plaintiff "adjust[s] and request[s] time off for a number of personal issues regularly" and that "[t]his makes [his] reliability questionable at times." (Dkt. No. 62-19, at 107). He received an overall rating of "Satisfactory." (*Id*. at 105). In November 2013, Moreno placed Plaintiff on a CAP with the goal of, inter alia, "working [his] assigned schedule." (Dkt. No. 62-19, at 109).

### 2.     2014

#### a.     CAP

In 2014, Plaintiff and his wife separated, and he was granted permanent custody of their child. (Dkt. No. 71-2, ¶ 9). In January 2014, Moreno issued another CAP to Plaintiff "because there was a lack of progress towards his goals in the 2013 CAP." (Dkt. No. 62-10, ¶ 25). The new CAP "stated that plaintiff was expected to work his assigned schedule unless authorized by the AOD or AD Treatment, and that a leave request must be submitted and approved prior to changes in plaintiff's assigned work schedule." (*Id*.) Moreno issued Plaintiff a counseling memo on January 22, 2014, which documented his attendance and tardiness issues. (Dkt. No. 62-11, at 14). This included ten days of unscheduled absences and leaving the grounds without permission in December 2013. (*Id*.). Moreno advised Plaintiff that, because he indicated he was having trouble working his scheduled hours due to personal reasons, "it is recommended that you follow up with . . . EAP for possible assistance." (*Id*.).

### b. Schedule Change

In January 2014, after the new policy allowing only YC2s to be scheduled as AODs was implemented, a shift bid took place and "all YC2's on the AOD rotation bid for his schedule based on seniority." (Dkt. No. 62-6, ¶ 14). Plaintiff, who had the least seniority, was assigned a work schedule that included four late-night shifts per week. (*Id*. ¶ 17). This was the first time Plaintiff had "seen a schedule of four 10-hour days" for any AOD. (Dkt. No. 62-3, at 153). The new schedule went into effect on February 20, 2014. (Dkt. No. 62-6, ¶ 17).

Due to Plaintiff's childcare needs, this new schedule was a "hardship." (Dkt. No. 62-3, at 157). When he communicated this difficulty to Mallick, Mallick told him that if he could not work his scheduled shifts, he should resign. (Dkt. No. 62-3, at 155–56). On February 9, 2014 Plaintiff requested a temporary accommodation in connection with his new work schedule, which Mallick, Judge, and Moreno denied. (Dkt. No. 62-3, at 65–67; Dkt. No. 71-2, ¶ 10).

After being denied this accommodation, Plaintiff told Mallick and Judge that he "had observed female coworkers receiving more favorable treatment than [he] was receiving. [He] told them that female employees who were mothers were routinely accommodated the times they worked." (Dkt. No. 71-2, ¶ 13). Plaintiff asked Mallick why Judge (who had a child) "did not work at least one late night as required. Instead of addressing [his] concerns, [Mallick] became visibly angry and started shouting at [Plaintiff]." (*Id*. ¶ 15).

### c. FMLA request

In February 2014, Plaintiff applied for leave under the Family Medical Leave Act ("FMLA") in order to care for his son. (Dkt. No. 62-19, at 4). The OCFS Bureau of Personnel denied Plaintiff's application because he had "requested leave for care for a child with no illness, which is not covered by [the] FMLA." (Dkt. No. 62-18, ¶ 9).

### d.    Medical Documentation Status

In March 2014, Moreno issued Plaintiff a memo "warn[ing] him about his time and attendance" because he "had more than seven unscheduled absences in twelve months." (Dkt. No. 62-10, ¶ 30). He was placed on "doctor's certification status for three months in accordance with OCFS policy." (*Id.*).

### e.    Performance Evaluation

In June 2014, Nanette Wright issued Plaintiff a yearly performance evaluation. (Dkt. No. 71-1, at 68–69). Moreno provided input into the evaluation, and Mallick reviewed it. (Dkt. No. 62-10, ¶ 69). Plaintiff received an "unsatisfactory" rating in four out of seven areas. (*Id.* ¶ 70). The evaluation noted attendance issues, including Plaintiff's absence from the facility for 32 days since February 2014 for personal and family issues. (Dkt. No. 62-19, at 120). Plaintiff disputed the performance evaluation and was prepared to appeal. (Dkt. No. 71-1, at 32). Mallick overturned the performance evaluation and rated Plaintiff as "satisfactory." (*Id.*).

### f.    Incident with Highland Resident

On June 3, 2014, "two codes were issued indicating an increasingly escalating situation" involving a Highland resident. (Dkt. No. 62-17, at 24). When Plaintiff arrived at the scene, the resident was trying to get out of a van and shouted "[g]et out of my way or I'll fuck you up." (*Id.* at 25). Plaintiff pushed the resident back into the van and yelled "[i]f you hit me, I will kill you." (*Id.*).

After the incident, "[t]he Justice Center was contacted to investigate the situation, as is typical with cases of possible improper use of force against a person with disabilities." (Dkt. No. 62-17, at 26). "OCFS used the investigation materials supplied by the Justice Center to assess wrongdoing by [Plaintiff]." (*Id.*). On May 6, 2015, Mallick served Plaintiff with a Notice of Discipline for this incident from OCFS Labor Relations proposing a four-month suspension

without pay. (Dkt. No. 71-1, at 53). Plaintiff grieved the notice, and on March 7, 2017, an arbitrator "determined that Plaintiff was guilty of some of the charges and implemented a penalty of a $1000 fine." (Dkt. No. 62-16, ¶ 19).

### g. Additional Schedule Changes

Another shift bid took place in June 2014, and Plaintiff was assigned to work two day shifts and three evening shifts per week. (Dkt. No. 62-10, ¶ 31). In October 2014, Plaintiff requested a change to his work schedule, which Moreno approved. (*Id*. ¶ 32).

## 3. 2015

### a. iPad Incident

On March 8, 2015, Plaintiff brought an iPad into Highland. (Dkt. No. 71-1, at 465). This violated a 2014 "Clear Bag" policy issued to employees via memo that "prohibited electronic devices in the facility." (Dkt. No. 62-6, ¶ 82; Dkt. No. 62-7, at 33). Plaintiff denies receiving the memo. (Dkt. No. 71-1, at 467). A co-worker, Eric Newton, also does not recall receiving the memo. (*Id*. at 770–71).[12]

When Plaintiff brought in the iPad, the security guard asked "Are these allowed?" (Dkt. No. 62-3, at 224). Plaintiff replied, "I think so. I'm not sure." (*Id*.). The guard then allowed him to enter with the iPad. (*Id*.). The guard reported the incident to the Highland administration. (Dkt. No. 62-10, ¶ 95). Moreno was assigned to investigate. (*Id*. ¶ 94). On March 10, 2015, "Mallick told [Plaintiff] that he was going to issue a counseling memorandum" for bringing the iPad into Highland. (Dkt. No. 71-2, ¶ 24). On March 17, 2015, "Moreno confirmed that [Plaintiff] would be issued a counseling memorandum." (*Id*. ¶ 25). On March 26, 2015, Moreno submitted her narrative report, concluding that Plaintiff should be subject to discipline, (Dkt. No. 62-10, ¶¶ 98–

---

[12] Newton states that he became aware of the policy once Plaintiff was investigated. (*Id*.).

99). Judge reviewed this determination. (Dkt. No. 62-8, ¶ 45). Mallick forwarded the investigation packet to OCFS Labor Relations and recommended that Plaintiff be disciplined. (*Id*. ¶ 46). Plaintiff alleges Mallick recommended a penalty of a four-month suspension without pay. (Dkt. No. 70, at 40–41).[13] On July 29, 2015, OCFS Labor Relations issued Plaintiff a Notice of Discipline charging him with violating Highland policy and proposing a four-month suspension without pay. (Dkt. No. 71-1, at 202). Plaintiff grieved the Notice of Discipline. (Dkt. No. 62-16, ¶ 22). An arbitrator issued a decision on July 14, 2017, finding Plaintiff guilty of violating the policy but that the four-month penalty was "not appropriate" and that the "appropriate penalty is a written reprimand." (*Id*.; Dkt. No. 62-17, at 50, 52).

### b.   Unauthorized Leave and Schedule Adjustment Investigation

During her investigation into the iPad incident, Moreno discovered that Plaintiff had left the facility on March 9, 2015 without notifying her or the AOD. (Dkt. No. 62-10, ¶ 100). According to Moreno, since Plaintiff "was scheduled to work an eight hour shift per day" and "does not receive time for a lunch break," this discovery prompted her "to further review the schedule that plaintiff was working." (*Id*.). On April 6, 2015, Moreno provided an investigative narrative to Mallick stating that Plaintiff "continuously adjusts his schedule and leaving [sic] without informing his supervisor," and had "used a total of 26 leave hours on his approved timesheets between January 1, 2015 and March 11, 2015, without prior approval or informing his supervisor and/or the AOD." (Dkt. No. 62-11, at 116–18). Moreno recommended Plaintiff be

---

[13] Defendants' statement of material facts asserts that "OCFS Labor Relations determined that plaintiff should be disciplined and sought a penalty of a four month suspension without pay." (Dkt. No. 62-1, ¶ 172). In response, Plaintiff asserts that "Defendants [sic] Mallick recommended the discipline." (Dkt. No. 70, at 41). Plaintiff failed to give a citation to the record to support this contention. However, elsewhere, Plaintiff alleges that the Facility Director recommends a specific penalty generally and cites to a portion of Judge's deposition. (Dkt. No. 71-1 at 198–99). He also asserts that Labor Relations generally accepted the Facility Director's recommendation. (Dkt. No. 71-2, ¶ 92). Drawing all reasonable inferences in Plaintiff's favor, the Court construes the evidence to support that Mallick made a specific recommendation to OCFS regarding the iPad incident.

disciplined. (*Id.* at 118). Mallick submitted Moreno's investigation report to OCFS Labor Relations on April 7, 2015 and proposed a Letter of Reprimand and a one-month suspension without pay. (Dkt. No. 71-1, at 41).

OCFS Labor Relations determined that "it is evident that [Plaintiff] has an issue with time and attendance, but the evidence does not suggest discipline at this time." (Dkt. No. 71-1, at 43). OCFS Labor Relations further noted that a number of Plaintiff's unauthorized absences were due to "a coding error." (*Id.*). As a result, Plaintiff was issued a counseling memo and put on medical documentation status "for a period of three months." (*Id.*)

### c.    Plaintiff's March 22 Complaint

While Moreno conducted her investigations regarding the iPad incident and Plaintiff's unauthorized leave and time adjustments, Plaintiff requested to work 9:00 to 5:00 for one week "due to personal reasons." (Dkt. No. 71-1, at 34). On March 17, 2015, Moreno denied his request via email and wrote that "a schedule adjustment is not authorized however, if you need to request time off you can submit a leave request and use accrued time." (*Id.*). In a reply on March 22nd, copying Mallick and Judge, Plaintiff wrote: "I feel as if I am being discriminated against. I only asked for accommodation for a short period of time. I see women in this facility who are accommodated due to the fact they have young children at home." (*Id.*). He also wrote that Moreno had previously been accommodated with an accelerated work week and "there are YDAs who are supposed to work 3-11 shift (which the bided [sic] for) but have been accommodated and now work 7a-3p for child rearing reasons," (*id.*), and "[t]here are Senior staff members on the facility schedule who are supposed to work 1 late night a week and never have."[14] (*Id.*). He concluded that "[a]s a single father with full physical custody of my 4 year old

---

[14] In his affidavit, Plaintiff identified Judge as one of these staff members. (Dkt. No. 71-2, ¶ 15).

son I am requesting the same accommodation that I have witnessed my Female colleagues and co-workers receive." (*Id.*). Plaintiff did not receive a response. (Dkt. No. 71-2, ¶ 32).

### d.    Plaintiff's March 24 Complaint

On March 24, 2015, Plaintiff emailed Moreno telling her that he had come in early that day and that he had to pick his son up at daycare at 5:30 p.m. the following day. (Dkt. No. 71-1, at 37). Plaintiff also inquired about meeting with Moreno and Mallick. (*Id.*). Mallick, who was copied on the email, replied that Plaintiff was not allowed to change his schedule without prior approval and that he had a "persistent pattern of working [his] own schedule." (*Id.*). Mallick also stated that if Plaintiff could not work his late nights, he must put in a leave request and seek approval. (*Id.*).

In response, Plaintiff wrote that he wanted to work something out and "[i]f [he] has to work a reduced work week without pay [he] will do that." (*Id.*). He also wrote "I have made a request and was denied by across the board OTHERS are being accommodated for their children. If I was a woman it would be different?" (*Id.*).

On March 26, Moreno and Plaintiff met to discuss Plaintiff's schedule. (Dkt. No. 62-11, at 34). According to a memorandum Moreno issued to Plaintiff recounting their meeting, they agreed that Plaintiff would put in leave requests for the times he could not work. (*Id.*). Specifically, they agreed Plaintiff would work Monday through Wednesday, 2:00pm until 5:00pm, and Thursday 9:00am until 5:00pm. Plaintiff would submit leave requests for his full shift on Sunday and 5:00pm to 10:00pm Monday through Wednesday. Moreno noted that "it is expected that [Plaintiff would] submit for a Reduced Work Schedule" and that they would "assist [Plaintiff] until a decision is made regarding [Plaintiff's] formal request of a Reduced Work Schedule." (*Id.*). Plaintiff, however, "never submitted a request to work a reduced schedule." (Dkt. No. 62-10, ¶ 40). Plaintiff also continued to adjust his schedule without submitting leave

requests. (Dkt. No. 62-11, at 36). As such, he was required to resume his normal schedule in May or June (which had been in place since February 1, 2015). (Dkt. No. 62-10, ¶¶ 35, 40).

### e. Timesheet Audit

On May 18, 2015, Moreno began "an audit of staff timesheets reviewed and submitted by the three YC2's under [her] direct supervision: [P]laintiff, Eric Newton, and Ray Rutland." (Dkt. No. 62-10, ¶ 87). Moreno interrogated both Plaintiff and Newton after she "discovered errors on timesheets reviewed and approved" by them. (*Id*. ¶¶ 89–90). When Newton asked why he was being audited, Moreno replied, "It's not you." (Dkt. No. 71-1, at 760). According to Newton, "in essence, [Moreno] said that [Newton] wasn't the target" and Newton interpreted Moreno's statements to mean that Plaintiff was the target. (*Id*. at 755). Newton called Plaintiff and told him Moreno had said "don't worry about it, we're only interrogating you so [Plaintiff] doesn't cry harassment." (*Id*. at 432).

Moreno "recommended that plaintiff be disciplined because he approved falsified time sheets submitted by staff members he supervised." (Dkt. No. 62-10, ¶ 91). On July 22, 2015, Judge sent the investigation to OCFS Labor Relations and recommended that Plaintiff be demoted from his YC2 position. (Dkt. No. 71-1, at 192). Judge did not recommend discipline for Newton. (Dkt. No. 71-1, at 618–19). OCFS Labor Relations "lost the investigation" and "after they discovered it, it was beyond a year. So [Plaintiff] did not get a discipline based on that technicality." (*Id*. at 564). Instead, OCFS Labor Relations directed that Plaintiff received a formal counseling memo in connection to his failure to adhere to time and accrual records policies. (Dkt. No. 62-9, at 25).

### f. Plaintiff's May 28 Complaint

On May 28, 2015, Plaintiff wrote an email to Moreno and Judge, copied to Mallick, complaining that a co-worker, Ms. Hicks, was "not working her late nights," and that "Moreno

had approved this." (Dkt. No. 71-1, at 49). Plaintiff wrote that "I am a single father of a little boy as Ms. Hicks is a single mother. Why is it that accommodation is [sic] made for a woman who is a single mother but not me . . . I would like to be accommodated also." (*Id*.). He also wrote that "it has come to my attention that non clinical assistant directors are to be working two 2pm-10pm shifts a week" but that Judge did not seem to be doing so and inquired whether it was because she had a young child at home. (*Id*.).

Mallick responded that if Hicks "is not working her schedule," Plaintiff, as Hicks's supervisor, "need[ed] to counsel her on adhering to her schedule." (Dkt. No. 71-1, at 51). He advised Plaintiff that "Judge is no concern to you as you are a YC2 and she is your supervisor." (*Id*.). He further stated that:

> If you spent more time on your job and your task standards you would be a more productive employee. If you have concerns regarding your personal schedule you need to file for reasonable accommodation. I'm tired of seeing you send the same emails out every other week attacking female employees of this facility.

(*Id*.). Plaintiff replied and asked "[w]hy would you say that my supervisor has no issue with my job performance. Is that comment retaliation for asking a question about gender equality?" (*Id*.).

### g.     Performance Evaluation

In June 2015, Moreno wrote and Mallick reviewed Plaintiff's June 2014 to June 2015 performance evaluation. (Dkt. No. 62-10, ¶ 75; Dkt. No. 62-11, at 86). One week before issuing the evaluation, Moreno told Plaintiff he was doing an "excellent job." (Dkt. No. 71-1, at 434; Dkt. No. 71-2, ¶ 39). In the evaluation, however, Plaintiff received unsatisfactory ratings in six out of seven areas. (Dkt. No. 62-11, at 83–86). Plaintiff suspected Judge had written his evaluation rather than Moreno. (Dkt. No. 71-2, ¶ 42; Dkt. No. 71-1, at 434). Moreno "told [Plaintiff] that she was going to change [his] evaluation because [Moreno] made mistakes in 'judgment.'" (Dkt. No. 71-2, ¶ 42). Moreno amended the evaluation by changing some of the

narrative and rating Plaintiff as satisfactory in four out of seven areas. (Dkt. No. 62-11, at 88–91). When Plaintiff continued to disagree with the evaluation, Moreno changed it again to give him an unsatisfactory in six out of seven areas, as she "had done originally." (Dkt. No. 62-10, ¶ 77).

### h. Mallick's Conversation with Frank Tamburro

Sometime before June 2015, Mallick had a conversation with Frank Tamburro (an OFCS employee) about Plaintiff. (Dkt. No. 71-2, ¶ 34; Dkt. No. 71-1, at 700–01). Tamburro had noticed tension between Plaintiff and Mallick and he wanted to help "rectify the issues." (Dkt. No. 71-1, at 701). Mallick told Tamburro that "he was not happy with [Plaintiff's] performance" and he thought Plaintiff should take a lower position at another facility, (*id*. at 703–704), with a 9 to 5 schedule, unlike Plaintiff's current position. (Dkt. No. 62-6, ¶ 53). When Tamburro indicated that Plaintiff would be unlikely to take a demotion, Mallick "got extremely agitated, slammed his hand on the desk and said 'He needs to take that position or I'm going to fire his dumb ass.'" (Dkt. No. 71-1, at 704). Mallick encouraged Tamburro to give Plaintiff the message. (*Id*. at 705). Tamburro reported this conversation to Plaintiff in June 2015. (Dkt. No. 71-2, ¶ 34).

### i. Paycheck incident

In June 2015, Plaintiff's paycheck was missing "more than $1200 in pay." (Dkt. No. 71-2, ¶ 44). Plaintiff brought the issue to Moreno's attention. (Dkt. No. 62-10, ¶ 106). The error was "an attempt to rectify inaccuracies in plaintiff's timesheet." (*Id*.). Mallick helped to arrange a salary advance to "ameliorate the impact of the error on [P]laintiff." (Dkt. No. 62-6, ¶ 86). Plaintiff claims he was taxed at a higher rate because of the mistake, which resulted in having an extra $175.00 withheld. (Dkt. No. 71-2, ¶ 45).

### j.     Plaintiff's June 28 Complaint

On June 28, 2015, Moreno issued Plaintiff two counseling memos regarding his unscheduled absences between March 26, 2015 and May 4, 2015 and tardiness between March 1, 2015 and April 13, 2015. (Dkt. No. 62-10, ¶¶ 41–42; Dkt. No. 62-11, at 36, 39). The unscheduled absences memo documented 17 occasions during which Plaintiff did not work his assigned schedule. (Dkt. No. 62-11, at 36–37). The tardiness memo documented nine occasions on which Plaintiff arrived late to work. (*Id*. at 39–40). Plaintiff signed the tardiness memo and handwrote: "I would hope this is for everyone. I feel I am being targeted. All staff <u>flex</u> there [sic] schedule without this Harassment [sic] . . . This is <u>continued discrimination</u>." (Dkt. No. 62-11, at 40). Moreno informed Mallick of Plaintiff's allegations the next day. (Dkt. No. 62-10, ¶ 44).

### k.     July Counseling Memo

On July 26, 2015, Moreno issued Plaintiff a counseling memo regarding "a pattern of excessive unscheduled and unauthorized tardiness and absences." (Dkt. No. 62-10, ¶ 46). Moreno again placed Plaintiff on medical documentation status for all future absences. (*Id*.). On August 6, 2015, Plaintiff grieved the memo and argued that OCFS policies for time and attendance had been violated. (Dkt. No. 62-11, at 49–52). The grievance was reviewed and denied by OCFS Labor Relations. (*Id*. at 57–62).

### l.     Razor Incident

In September 2015, there was a mock audit of Highland, during which Moreno "discovered razors in the desk of an employee under [P]laintiff's supervision." (Dkt. No. 62-10, ¶ 115). The razors were in an unlocked desk in a secured area. (Dkt. No. 71-1, at 780–81; Dkt.

No. 71-2, ¶ 47).[15] Moreno "secured the razors in [Plaintiff's] office" and "told [him] to secure them." (Dkt. No. 62-10, ¶ 115).

Moreno informed Judge of the incident, and Judge directed Moreno to further investigate. (*Id.* ¶ 116). At the time of the audit, there was no local operating policy regarding securement of razors at Highland. (Dkt. No. 71-1, at 584–86).[16] A local policy regarding razors was approved shortly after the mock audit. (*Id.* at 217).

Moreno prepared a report, which she sent to Judge, following her investigation in which she concluded that Plaintiff "demonstrates an inability to supervise staff." (Dkt. No. 62-11, at 129). After reviewing the report, on October 20, 2015, Judge recommended to OCFS Labor Relations that Plaintiff be terminated. (Dkt. No. 62-8, ¶ 50; Dkt. No. 71-1, at 220).

Judge testified that during the audit, it was discovered that another employee had not followed protocols regarding fire extinguishers, and she wanted "that matter examined." (Dkt. No. 71-1, at 595). Following an inquiry into the matter, Judge determined that the employee had knowingly put inaccurate inspection dates on the fire extinguishers. (*Id.* at 596). Judge stated that the employee "was formally counseled on the matter." (*Id.*).

### m.    EpiPen Incident

On September 30, 2015, a YDA under Plaintiff's supervision was assigned to carry an EpiPen but left it in the staff office. (Dkt. No. 62-12, ¶ 20). Another staff member found the pen and gave it to Plaintiff. (*Id.*). Plaintiff secured the EpiPen in his office and did not inform anyone

---

[15] Defendants argue that the area was unsecured. (Dkt. No. 62-10, ¶ 115). However, both Paul Solomon (the employee in whose desk Moreno found the razors) and Plaintiff attest the area was secure. (Dkt. No. 71-1, at 780–81; Dkt. No. 71-2, ¶ 47). As such, drawing all reasonable inferences in favor of Plaintiff, the Court assumes the area was not accessible to residents.

[16] Defendants contend that while there was no local policy in effect at Highland, there was a global OCFS Hygiene policy that required razors to be secured. (Dkt. No. 62-10, ¶ 119). However, Plaintiff disputes this. (Dkt. No. 70, ¶ 182). Given that the record does not contain the global Hygiene policy, the Court, drawing all reasonable inferences in Plaintiff's favor, concludes there was no global policy in effect at that time regarding razors.

where it was before leaving for the day. (*Id*.). The next morning, Plaintiff returned the EpiPen to the Medical Department. (Dkt. No. 62-13, at 30). Lucky was assigned to investigate the incident. (Dkt. No. 62-12, ¶ 18). Lucky determined that Plaintiff had failed to follow his EpiPen training and had "failed to use good judgment by leaving the facility and not informing staff that the [EpiPen] was secured in his office." (*Id*. ¶ 21). On January 14, 2016,[17] Judge (who reviewed Lucky's investigation materials) recommended to OCFS Labor Relations that Plaintiff receive a three-month suspension. (Dkt. No. 62-8, ¶ 57; Dkt. No. 71-1, at 241).

### n. Plaintiff's EEOC Charge

Plaintiff filed an Equal Employment Opportunity Commission ("EEOC") complaint on December 2, 2015, alleging discrimination and retaliation. (Dkt. No. 62-15, at 94).

### 4. 2016

### a. Counseling Memos

Lucky, now Plaintiff's supervisor, issued Plaintiff several memos in February 2016. (Dkt. No. 62-12, ¶¶ 30–32). Two of these memos, issued on February 10 and 11, concerned Plaintiff's failure to "acquire a doctor's note for a staff under [his] supervision," who had been absent for ten days, and Plaintiff's "unscheduled absence" on February 11th. (Dkt. No. 62-13, at 36–38). On February 21st, Lucky issued Plaintiff a "Formal Counseling" memo regarding his failure to have 25% sick leave accruals and placed Plaintiff on medical documentation status. (*Id*. at 40).

### b. EEOC Investigation

On March 9, 2016, Robert Wilson from the OCFS's Equal Opportunity and Diversity Development Office ("EODD"), interviewed Mallick, Judge, and Moreno concerning an

---

[17] The Court notes that the EpiPen investigation report submitted by Judge to OCFS Labor Relations is dated "January 14, 2015." (Dkt. No. 71-1, at 241). However, given the dates discussed in the report itself, the Court construes this date to be January 14, 2016.

"investigation to assist agency counsel in responding to EEOC charge of discrimination." (Dkt. No. 71-1, at 379). Wilson interviewed Plaintiff on March 14, 2016. (*Id*.).

Wilson also interviewed Tamburro in the course of his investigation. (Dkt. No. 71-1, at 707–08). Tamburro told Wilson about the conversation he had with Mallick during which Mallick threatened to fire Plaintiff unless Plaintiff took a demotion. (*Id*. at 709). At some point after his interview with Wilson, in "early spring of 2016," Tamburro's job duties were removed and he was no longer allowed to go any facilities, including Highland. (*Id*. at 710–11). Tamburro testified that his supervisor told him that he "had no idea" why Tamburro's responsibilities were removed. (*Id*. at 711). Tamburro continued to be paid but "came to work every day and sat at [his] desk for eight hours a day and had nothing to do." (*Id*. at 715). His supervisor actively attempted to get work for him but those attempts "were constantly rejected." (*Id*. at 717). Tamburro attributes having his responsibilities removed to "either meeting with Mr. Wilson" or his friendship with Plaintiff. (*Id*. at 713).

### c.    Justice Center Investigation

On March 15, 2016, following a complaint by a resident at Highland concerning an employee that Plaintiff supervised, Plaintiff was interrogated by the Justice Center for the Protection of People with Special Needs ("Justice Center"). (Dkt. No. 71-2, ¶ 69). The resident had made the same complaint to at least five other staff members, none of whom reported the complaint to the Justice Center. (*Id*. ¶ 70). Plaintiff asked Lucky and another Assistant Director if he should report the complaint to the Justice Center and did not get a response. (*Id*. ¶ 71). Plaintiff was then reported to the Justice Center for failing to report the incident. (*Id*. ¶ 72).[18] On The Justice Center investigation did not find Plaintiff guilty of any wrongdoing. (*Id*.).

---

[18] Plaintiff alleges "upon information and belief" that Lucky was the one who reported him to the Justice Center. (Dkt. No. 71-2, ¶ 72). Plaintiff has provided no other evidence of this allegation, and therefore the Court does not credit it.

### d. Inspection of Plaintiff's Unit

On March 16, 2016, one week after the EODD interview, Mallick, accompanied by Lucky, conducted an unscheduled inspection of Plaintiff's unit. (Dkt. No. 71-2, ¶¶ 62, 109; Dkt. No. 62-12, ¶¶ 23–24). Mallick told Lucky to check Plaintiff's unit every day going forward, (Dkt. No. 71-2, ¶ 62), and Lucky did so. (*Id.* ¶ 63). Lucky issued Plaintiff a counseling memo regarding the state of his unit. (Dkt. No. 62-13, at 34). According to Tamburro, the unit looked unclean because there was an issue with a mechanical air handler in Plaintiff's unit, which was "not pressured right" and was "drawing debris, lint fabrics and stuff, from the rooms, pulling it into the hallway." (Dkt. No. 71-1, at 747–48). When Tamburro informed Lucky of the problem, Lucky replied that Plaintiff is "not keeping the unit clean, he's not doing what he's supposed to be doing." (*Id.* at 748).

### e. Report to Justice Center

Lucky "reduced the number of employees in [Plaintiff's] unit from three to two per shift making it impossible for staff to perform the work required."[19] (Dkt. No. 71-2, ¶ 67). On March 29, 2016, Plaintiff "learned that because of Lucky's unreasonable demands to staff, an employee was forced to leave another staff member who was not supposed to be left alone with youth unsupervised." (Dkt. No. 71-2, ¶ 73). This created "a significant threat to the health, safety and security of the youth." (*Id.* ¶ 74). Plaintiff reported Lucky and Judge to the Justice Center. (*Id.*).

---

*See D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998) (explaining that, at summary judgment, "[t]he non-moving party may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful."); *see also Hicks v. Baines*, 593 F.3d 159, 167 (2d Cir. 2010) (upholding summary judgment because, inter alia, the plaintiff had only offered "speculation" as to whether the defendant was responsible for the adverse action).

[19] Plaintiff did not provide a timeframe.

### f. Office

On April 21, 2016, Lucky directed Plaintiff to move his office from the back of the unit to the front of the unit. (Dkt. No. 62-12, ¶ 51). Plaintiff's old office was "spacious," but the new office was "a small area the size of a closet." (Dkt. No. 71-2, ¶ 76). In response to being asked to move offices, Plaintiff emailed Lucky and asked, "was this a practice that will be instituted for all YC2s here at HRC or is this punishment to me for calling the justice center?" (Dkt. No. 71-1, at 258). In response, Lucky issued Plaintiff a formal counseling memo for "making outlandish and irresponsible accusations." (*Id*. at 364).

### g. Attorney letter to EEOC

On April 16, 2016, Plaintiff's attorney wrote to the EEOC asking it to issue a Notice of Right to Sue, and asserting that she would be "representing [Plaintiff] in federal litigation against NYS OCFS and various officials/employees." (*Id*. at 56). Mallick, Moreno, Judge, and Lucky were copied on the letter. (*Id*. at 57).

### h. Performance Evaluation

On May 31, 2016, Lucky completed Plaintiff's performance evaluation for the June 2015 to June 2016 period. (Dkt. No. 62-12, ¶ 35; Dkt. No. 62-13, at 46). He gave Plaintiff an unsatisfactory rating in five out of eight areas, resulting in an overall unsatisfactory rating. (*Id*.; Dkt. No. 62-13, at 45–50).

### i. Suspension

In a letter dated May 31, 2016, OCFS Labor Relations notified Plaintiff that he had been found guilty of insubordination and misconduct in connection with the razor and EpiPen incidents and that OCFS "proposes a penalty of termination." (Dkt. No. 62-9, at 60). The same day, OCFS Labor Relations issued Notices of Discipline and Suspension advising Plaintiff that he was "immediately suspended without pay" "because it has been determined that [his]

presence on the job would severely interfere with operations." (Dkt. No. 62-9, at 55–57). Judge served the Notices of Discipline and Suspension on Plaintiff. (Dkt. No. 62-8, ¶¶ 60–62). Plaintiff remained suspended without pay for eleven months, (Dkt. No. 71-2, ¶ 79), but eventually settled the disciplinary proceeding by generally admitting to the allegations and agreeing to a six-month suspension. (Dkt. No. 62-17, at 61).

### j. Commencement of the Instant Action

On October 24, 2016, Plaintiff filed the instant Complaint. (Dkt. No. 1).

### 5. 2017

### a. Reassignment

When Plaintiff was preparing to return to work, he received a new work assignment and was told to report to Brookwood Secure Center. (Dkt. No. 62-3, at 150–151). Brookwood is farther from his home. (*Id.* at 150–52). Plaintiff grieved this placement, and his grievance was upheld. (*Id.* at 151). He was then assigned to Highland. (*Id.*).

### b. Counseling Memos and Training

Before returning to Highland, Plaintiff "had to be retrained" and was "sent to the Parker Training Academy." (Dkt. No. 71-2, ¶ 84). Lucky and another supervisor, Corey Jackson, issued counseling memos to Plaintiff on the first day of training. (*Id.* ¶ 85; Dkt. No. 71-1, at 326). These memos pertained to Plaintiff's schedule[20] and tardiness[21] during training. (Dkt. No. 71-1, at 326–

---

[20] The memo, dated May 15, 2017, from Jackson regarding Plaintiff's training schedule outlines "the parameters for expectations" while Plaintiff was "attending training at Parker Training Academy" and the "special accommodations" that were made so that Plaintiff could put his son on the school bus in the mornings. (Dkt. No. 71-1, at 328).

[21] The memo, dated May 15, 2017, from Lucky regarding Plaintiff's tardiness to training referenced a meeting with Jackson on May 10, 2017 to discuss Plaintiff's training attendance and the expectation that Plaintiff would report to training by 8:30 a.m. each day. (Dkt. No. 71-1, at 326). Lucky wrote that it was brought to his attention that Plaintiff had called on May 15, 2017 stating that he "would be late to class due to car trouble and would be at Parker by 9 a.m.," but that he "did not arrive till 9:15 a.m." (*Id.*). Lucky advised Plaintiff that he was expected "to be present in the classroom no later than 8:30 a.m. till the end of class at 5:00 p.m., that this was "a daily expectation," and that "failure to adhere to this directive may result in administrative action." (*Id.*).

28). On May 19, 2017, the end of the first week, Plaintiff injured his shoulder during training. (Dkt. No. 71-2, ¶ 86). Plaintiff "went out on workers' compensation and returned to work on July 28, 2017." (*Id*.).

### c. Performance Evaluation

On June 1, 2017, while Plaintiff was out on workers' compensation, Lucky completed Plaintiff's performance evaluation for the June 2016 to June 2017 period. (Dkt. No. 71-1, at 330–32). Plaintiff had been suspended without pay for the entire time period the performance evaluation covered, except for the week he was at training. The performance evaluation noted that Plaintiff's job performance "cannot be accurately evaluated due to the employee being suspended for a significant portion of the evaluation period." (*Id*. at 331–32). However, Lucky rated Plaintiff as "unsatisfactory" in all areas, despite "N/A" being an option. (*Id*.).

## III. STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp*. *v*. *Catrett*, 477 U.S. 317, 322 (1986); *see also Anderson v*. *Liberty Lobby, Inc*., 477 U.S. 242, 247–48 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys v*. *City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*). The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *see also Selevan*

*v. N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (summary judgment appropriate where the nonmoving party fails to "'come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on' an essential element of a claim" (quoting *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010))).

If the moving party meets this burden, the nonmoving party must "set out specific facts showing a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323–24; *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). Still, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir.1986) (quoting *Quarles v. Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985)). Furthermore, "[m]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)).

## IV. DISCUSSION

### A. Title VII

Plaintiff alleges that Defendant OCFS ("Defendant") violated Title VII by engaging in discrimination and retaliation. (Dkt. No. 1, ¶¶ 54–57). Defendant argues that some of Plaintiff's Title VII claims are untimely or were not exhausted, and therefore should be dismissed. (Dkt.

No. 62-24, at 15–19). Defendant further argues that Plaintiff has failed to establish OCFS violated Title VII. (*Id.* at 19–33). The Court will address each of these arguments.

### 1.    300-Day Statute of Limitations

"As a precondition to filing a Title VII claim in federal court, a plaintiff must first pursue available administrative remedies and file a timely complaint with the EEOC." *Hardaway v. Hartford Pub. Works Dep't*, 879 F.3d 486, 489 (2d Cir. 2018) (quoting *Deravin v. Kerik*, 335 F.3d 195, 200 (2d Cir. 2003)); *see also* 42 U.S.C. § 2000e–5(e) and (f). "Title VII requires that individuals aggrieved by acts of discrimination [in states like New York] file a charge with the EEOC within . . . 300 days 'after the alleged unlawful employment practice occurred.'" *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 78–79 (2d Cir. 2015) (quoting 42 U.S.C. § 2000e–5(e)(1)). Failing to timely file a charge "acts as a bar to a plaintiff's ability to bring the action." *Semper v. N. Y. Methodist Hosp.*, 786 F. Supp. 2d 566, 576 (E.D.N.Y. 2011) (citing *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1982)). Though time-barred, discrete prior acts falling outside the limitations period may be used as "background evidence in support of a timely claim." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002).

Defendant correctly argues that, because Plaintiff filed his EEOC complaint on December 2, 2015, (Dkt. No. 62-15, at 94), any alleged discriminatory actions or retaliation that occurred before February 5, 2015 (300 days prior) are time-barred for Plaintiff's Title VII claims. Plaintiff concedes this point. (Dkt. No. 72, at 14).[22] Thus, when analyzing Plaintiff's Title VII claims, the

---

[22] Plaintiff admits that the sex discrimination allegations in his Complaint regarding paternity leave, the denial of his FMLA request, and schedule adjustments in 2014 are time-barred. (Dkt. No. 1; Dkt. No. 72, at 19).

Court will consider events prior to February 2015 only as "relevant background evidence." *Morgan*, 536 U.S. at 112.[23]

## 2.    Exhaustion

Before bringing a claim under Title VII, a plaintiff must exhaust his administrative remedies by filing a charge with the EEOC. *See* 42 U.S.C. § 2000e-5(e)(1), (f)(1); *Fort Bend Cty. v. Davis*, 139 S. Ct. 1843, 1846 (2019). This requirement is not jurisdictional; instead, it is "properly ranked among the array of claim-processing rules that must be timely raised to come into play." *Davis,* 139 S. Ct. at 1846; *see also id*. at 1851. And although a plaintiff may not pursue an unexhausted claim, courts may "consider all claims to the extent they are 'reasonably related' to those" the plaintiff asserted in a timely EEOC charge. *Mathirampuzha v. Potter*, 548 F.3d 70, 75 (2d Cir. 2008). A claim is reasonably related to allegations in an EEOC charge if "the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *Id*. at 76 (quoting *Terry v. Ashcroft*, 336 F.3d 128, 151 (2d Cir. 2003)).

The central question is whether the charge filed gave the EEOC "adequate notice to investigate discrimination" on the newly-raised basis. *Id*. at 77 (quoting *Williams v. N.Y.C. Hous. Auth*., 458 F.3d 67, 70 (2d Cir. 2006)). "This exception to the exhaustion requirement 'is essentially an allowance of loose pleading' and is based on the recognition that 'EEOC charges frequently are filled out by employees without the benefit of counsel and that their primary purpose is to alert the EEOC to the discrimination that a plaintiff claims [he] is suffering.'"

---

[23] Unlike Plaintiff's Title VII claims, his NYSHRL and § 1983 claims have a three-year statute of limitations. N.Y. C.P.L.R. § 214(2); *Hogan v. Fischer*, 738 F.3d 509, 517 (2d Cir. 2013) ("Section 1983 actions filed in New York are . . . subject to a three-year statute of limitations.").

*Deravin*, 335 F.3d at 201 (quoting *Butts v. City of N.Y. Dep't of Hous. Pres. & Dev.*, 990 F.2d 1397, 1402 (2d Cir. 1993)).

Additionally, subsequent conduct is reasonably related to conduct described in an EEOC charge if the claim concerns "retaliation for filing the EEOC charge" or "further incidents of discrimination carried out in precisely the same manner alleged in the EEOC charge." *Alfano v. Costello*, 294 F.3d 365, 381 (2d Cir. 2002) (quoting *Butts*, 990 F.2d at 1402–03). "In the paradigmatic case for which the 'reasonably related' doctrine was adopted, retaliation occurs while the EEOC charge is still pending before the agency." *Duplan v. City of New York*, 888 F.3d 612, 622 (2d Cir. 2018).

Defendant contends that Plaintiff failed to include the following allegations in his EEOC complaint, and they therefore are not exhausted and should be dismissed: "(1) denial of paternity leave; (2) denial of FMLA leave; (3) change of a work schedule in May 2015; (4) money improperly withheld from plaintiff's paycheck; (5) interrogation investigation and discipline related to the September 26, 2015 razor incident; (6) interrogation investigation and discipline related to an October 2015 epi-pen incident; (7) false performance evaluations; (8) attempted termination in May 2016; (9) being reported to the Justice Center in March 2016; and (10) inspection of plaintiff's unit in March 2016." (Dkt. No. 62-24, at 19). Additionally, Defendant contends that any allegations concerning Lucky's purported understaffing of Plaintiff's unit and moving his office occurred after the EEOC complaint was filed and have not been exhausted. (*Id*. at 18).

The Court is unpersuaded. As Plaintiff argues, the incidents that allegedly occurred prior to the EEOC complaint are all reasonably related to Plaintiff's EEOC charge that he was being

discriminated and retaliated against.[24] Plaintiff, who filled out the charge form pro se, checked the boxes for "sex" discrimination and "retaliation." (Dkt. No. 62-15, at 93). Additionally, the narrative of the charge explained that he had been subjected to disparate treatment regarding his work schedule and retaliation for voicing his concerns. (*Id*. at 93–94). This included a campaign to "discharge [him] under false pretenses." (*Id*. at 94). The razor and EpiPen incidents are reasonably related to this charge because they formed the basis for OCFS's termination recommendation in May 2016. (Dkt. No. 62-9, at 60). Similarly, withholding funds from Plaintiff's paycheck and changing his schedule in May 2015 relate to the harassment and retaliation allegations contained in the EEOC charge. (Dkt. No. 62-15, at 93). Plaintiff's EEOC charge therefore provided the EEOC with "adequate notice" to investigate. *Williams*, 458 F.3d at 70.

Furthermore, the 2016 incidents that occurred after Plaintiff's EEOC charge can be construed as retaliation for filing the charge and further attempts to "discharge [Plaintiff] under false pretenses." (Dkt. No. 62-15, at 93). As such, these subsequent actions are reasonably related to Plaintiff's EEOC charge because they can be considered retaliation for the EEOC or "further incidents of discrimination carried out in precisely the same manner alleged in the EEOC charge." *Alfano*, 294 F.3d at 381 (quoting *Butts*, 990 F.2d at 1402–03).

Accordingly, the Court finds that Plaintiff's claims were exhausted.

### 3. Sex Discrimination

The only timely discrimination claim that remains is Plaintiff's allegation that the denial of his requests for schedule adjustments from March to May 2015 were discriminatory. (Dkt. No.

---

[24] The Court notes that the denial of paternity leave and FMLA leave do not constitute claims under Title VII because they are untimely, *see supra* Section IV.A.1. Plaintiff has not brought a separate FMLA claim.

72, at 19). Discrimination claims under Title VII are generally evaluated under the *McDonnell Douglas* burden-shifting analysis. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Maraschiello v. City of Buffalo Police Dep't*, 709 F.3d 87, 92 (2d Cir. 2013); *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993). First, the plaintiff must establish, by a preponderance of the evidence, a prima facie case of discrimination. *St. Mary's*, 509 U.S. at 506. "The requirements to establish a prima facie case are 'minimal,' and a plaintiff's burden is therefore 'not onerous.'" *Bucalo v. Shelter Island Union Free Sch. Dist.*, 691 F.3d 119, 128 (2d Cir. 2012) (citation omitted) (first quoting *St. Mary's*, 509 U.S. at 506; then quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

Establishing a prima facie case creates a presumption that the employer unlawfully discriminated against the employee. *St. Mary's*, 509 U.S. at 506. The burden then shifts to the defendant, who must articulate a legitimate, nondiscriminatory reason for its actions. *Id.* at 507. If the defendant carries that burden, the presumption of discrimination "drops from the picture," and the burden shifts back to the plaintiff, who must "come forward with evidence that the defendant's proffered, non-discriminatory reason is a mere pretext for actual discrimination." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000); *see also Zann Kwan v. Andalex Grp., LLC*, 737 F.3d 834, 845 (2d Cir. 2013). "The plaintiff must produce not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the [defendant] were false, and that more likely than not [discrimination] was the real reason for the [employment action]." *Weinstock*, 224 F.3d at 42 (alterations in original) (internal quotation marks omitted).

### a.      Prima Facie Case

To establish a prima facie case of employment discrimination under Title VII, a plaintiff must show that: (1) he is a member of a protected class; (2) he was qualified for the position he

held; (3) he suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to an inference of discrimination. *Bennett v. Hofstra Univ.*, 842 F. Supp. 2d 489, 497 (E.D.N.Y. 2012) (citing *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 491–92 (2d Cir. 2009)).

Plaintiff is a member of a protected class and was qualified for his position at Highland, satisfying the first two prongs. He argues that he suffered an adverse employment action when Defendant refused to allow him to adjust his work schedule in March to May 2015. (Dkt. No. 72, at 19). Defendant does not argue that the refusal to adjust Plaintiff's schedule did not constitute an adverse action, (*see* Dkt. No. 62-24, at 20–22), and thus for the purposes of this motion the Court will assume this prong is satisfied.

Accordingly, the issue here is whether the surrounding circumstances give rise to an inference that Defendant's refusal to adjust Plaintiff's schedule arose from gender discrimination. "The 'ultimate issue' in an employment discrimination case is whether the plaintiff has met [his] burden of proving that the adverse employment decision was motivated at least in part by an 'impermissible reasons,' *i.e.*, a discriminatory reason." *Vega*, 801 F.3d at 87 (quoting *Stratton v. Dep't for the Aging for City of N.Y.*, 132 F.3d 869, 878 (2d Cir. 1997)). This prong may be satisfied by "direct evidence of intent to discriminate or by indirectly showing circumstances giving rise to an inference of discrimination." *Vega*, 801 F.3d at 87 (citations omitted).

### i.      Discriminatory Intent

In 2010, Mallick commented that "women – not men should be taking" parental leave, (Dkt. No. 71-2, ¶ 7). This serves as background evidence of discriminatory intent. However, the Court must also consider the fact that this comment occurred five years prior. *See Tomassi v. Insignia Fin. Grp., Inc.*, 478 F.3d 111, 115 (2d Cir. 2007) ("[T]he more remote and oblique the

remarks are in relation to the employer's adverse action, the less they prove that the action was

motivated by discrimination."), *abrogated in part on other grounds by Gross v. FBL Fin. Servs.,*

*Inc.*, 557 U.S. 167 (2009). While Mallick's comment is remote, it is not oblique.

### ii.    Disparate Treatment

Plaintiff argues that he was subjected to disparate treatment. "A showing of disparate

treatment—that is, a showing that the employer treated plaintiff less favorably than a similarly

situated employee outside his protected group—is a recognized method of raising an inference of

discrimination for purposes of making out a prima facie case." *Mandell v. Cty. Of Suffolk*, 316

F.3d 368, 379 (2d Cir. 2003). In order to be similarly situated in "all material respects," " a

plaintiff must show that [his] co-employees were subject to the same performance evaluation and

discipline standards" and "engaged in comparable conduct." *Graham v. Long Island R.R.*, 230

F.3d 34, 40 (2d Cir. 2000).

Plaintiff states that "Highland's female employees, who are mothers, are routinely

accommodated in connection with the hours worked in order to take care of their children." (Dkt.

No. 71-2, ¶ 12). He argues that he was similarly situated to these employees but was denied

schedule accommodations to care for his child, giving rise to an inference of discrimination.

(Dkt. No. 72, at 19). Defendant argues that "there is no admissible evidence that OCFS adjusted

the work schedules of single mothers with young children, any more, or any differently, than it

adjusted plaintiff's schedule." (Dkt. No. 62-24, at 21).

Plaintiff's statements that female employees who were mothers were routinely

accommodated, and he was not, (Dkt. No. 71-2, ¶¶ 12–13), are conclusory and vague and do not

give rise to an inference of discrimination. *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir.

2008) ("[A] plaintiff must provide more than conclusory allegations to resist a motion for

summary judgment."); *see also Hicks*, 593 F.3d at 167 ("[A] party cannot create a triable issue of

fact merely by stating in an affidavit the very proposition they are trying to prove."). As such, to establish a prima facie case of gender discrimination Plaintiff must demonstrate that employees who are similarly situated to him in "all material respects" were accommodated more than him. *See Graham*, 230 F.3d at 40. The evidentiary record before the Court on this question is sparse.

Plaintiff identified seven female co-workers who were allegedly granted accommodations for childcare: Defendants Moreno and Judge, and Babcock, Hicks, Pazienza, Romano, and Carson. As an initial matter, Babcock did not have children, (Dkt. No. 62-21, ¶ 4), and Pazienza's children were adults during the relevant time period. (Dkt. No. 62-22, ¶ 4). As such, they are not similarly situated. Plaintiff has failed to provide any evidence that Carson or Romano, who did not have the same position as Plaintiff,[25] were similarly situated or engaged in comparable behavior. *Graham*, 230 F.3d at 40.

Plaintiff accused Judge twice of not working late night shifts, once in 2014, (Dkt. No. 71-2, ¶ 15), and once in 2015. (Dkt. No. 71-1, at 49). Plaintiff also alleges that Hicks "rarely" worked her late-night shifts, with Moreno's permission. (Dkt. No. 71-2, ¶ 98). On March 23, 2015, Hicks emailed Plaintiff to request to come in late due to childcare needs and Plaintiff approved her request. (Dkt. No. 71-1, at 286). On May 28, 2015, Plaintiff wrote an email to Moreno and Mallick to alert then that Hicks had "only worked one late-night 1-9pm in [the] span [of two weeks]." (Dkt. No. 71-1, at 49). Plaintiff also alleged that YDAs were having their schedules adjusted for childcare reasons,[26] and senior staff members were not working their required late-night shifts. (Dkt. No. 71-1, at 34).

---

[25] Romano was a unit clinician. (Dkt. No. 62-23, ¶¶ 1–2). The parties do not indicate what Carson's position was, but the record suggests she was an Assistant Director during the relevant time period. (Dkt. No. 71-1, at 242, 262, 591).

[26] On March 22, 2015, Plaintiff sent an email to Moreno, copied to Mallick and Judge, stating that "there are YDAs who are supposed to work 3-11 shift (which the bided [sic] for) but have been accommodated and now work 7a-3p for child rearing reasons." (Dkt. No. 71-1, at 34). However, Plaintiff has failed to identify any such YDAs and has provided no evidence that the position of YDA is a comparable to the position of YC2 (Plaintiff's position).

Plaintiff thus offers some evidence to support his general contention that female employees were accommodated, but in order for an inference of discrimination to arise he also needs to show he was accommodated less than similarly situated co-workers. The evidence, however, is replete with instances during which Plaintiff's schedule was accommodated due to his childcare needs. (Dkt. No. 62-10, ¶¶ 32, 35, 37; Dkt. No. 62-8, ¶ 23). Thus, even if female co-workers were also accommodated due to childcare responsibilities, it is unclear whether Plaintiff received less accommodations.

Additionally, none of the female co-workers that Plaintiff named had the same position or responsibilities that he did. Moreno, Judge, and Hicks all had different positions from Plaintiff.[27] Moreover, Judge and Moreno were higher up in the chain of command than Plaintiff, and Plaintiff supervised Hicks. Plaintiff admits that Moreno, Judge, and Hicks all had different "tasks and standards" from him. (Dkt. No. 71-1, at 414–15). Additionally, Judge had been assigned to be "point person for the Justice Center" and her hours had been set "so that she worked when the Justice Center came to Highland, which was generally Monday through Friday, 9:00 a.m. to 5:00 p.m." (Dkt. No. 62-6, ¶ 44). Defendant thus has a strong argument that Judge, Moreno, and Hicks did not have sufficiently similar positions and responsibilities. Plaintiff has also not offered any evidence that these female co-workers engaged in comparable conduct, i.e. that they had a documented history of time and attendance issues dating back over three years. *See infra* Section IV.A.3.b. In view, however, of the evidence that these proposed comparators were all ultimately supervised by Mallick and because "[w]hether two employees are similarly situated

---

[27] During the relevant time period in 2015, Moreno was an Assistant Director, (Dkt. No. 62-10, ¶¶ 4–5), Judge was Second in Charge, (Dkt. No. 62-8, ¶ 4), and Hicks was a YC1. (Dkt. No. 62-20, ¶ 2).

ordinarily presents a question of fact for the jury," *Graham*, 230 F.3d at 39, the Court concludes

Plaintiff has adduced some evidence of disparate treatment.

Thus, viewing Mallick's comment that "women – not men should be taking" parental

leave, (Dkt. No. 71-2, ¶ 7), together with the evidence of disparate treatment suffices to meet the

"minimal" "burden of proof . . . to establish a prima facie case." *Hollander v. American*

*Cyanamid Co*., 172 F.3d 192, 199 (2d Cir. 1999). Furthermore, an "extra measure of caution is

merited . . . because direct evidence of discriminatory intent"—present here—"is rare and such

intent often must be inferred from circumstantial evidence." *Holtz v. Rockefeller & Co*., 258 F.3d

62, 69 (2d Cir. 2001). Accordingly, the Court finds that Plaintiff has established a prima facie

case for gender discrimination.

### b.       Nondiscriminatory Reasons for Adverse Employment Action

Because the Court finds Plaintiff has established a prima facie case of discrimination with

respect to Defendant's refusal to provide schedule accommodations, a presumption of

discrimination arises. The burden now shifts to Defendant to demonstrate some legitimate,

nondiscriminatory reason for the adverse decision or action. *McDonnell Douglas Corp*., 411 U.S.

at 802; *United States v. Brennan*, 650 F.3d 65, 93 (2d Cir. 2011).

Defendant argues that "it was very important that staff at Highland worked their assigned

shifts because the facility needed to have adequate coverage at all times," so Highland

employees were required to "comply with OCFS Time and Attendance policies, including

working their assigned schedules, informing management if expected to be tardy or absent in

advance, [and] not leaving Highland without informing management." (Dkt. No. 62-24, at 23).

According to Defendant, "Plaintiff failed to comply with these requirements" and "became

unreliable," so he "was no longer permitted to adjust his schedule but, instead, was permitted to

use accrued time and seek permission to work a reduced schedule." (*Id*.).

Defendant has thus submitted evidence that the decision not to allow Plaintiff to adjust his schedule was based on legitimate, non-discriminatory reasons. As early as 2012, both Plaintiff's co-workers and supervisors raised concerns about his reliability due to his repeated schedule adjustments. (Dkt. No. 62-7, at 2; Dkt. No. 62-19, at 107; Dkt. No. 62-19, at 120). He was put on a CAP with the goal of working his assigned schedule. (Dkt. No. 62-19, at 109). When he failed to make progress, he was issued another CAP. (Dkt. No. 62-10, ¶ 25). During the course of the iPad investigation, for instance, his supervisor discovered Plaintiff had left the facility without telling anyone. (Dkt. No. 62-10, ¶ 100). This led to further investigation, and Moreno found that Plaintiff "continuously adjusts his schedule and leaving [sic] without informing his supervisor." (Dkt. No. 62-11, at 116). In March 2015, Moreno and Plaintiff reach an agreement on how Plaintiff was to manage his schedule. (Dkt. No. 62-11, at 34). Plaintiff was supposed to submit leave requests for the times he could not work, and submit a request for a Reduced Work Schedule. (*Id*.). However, despite this agreement, Plaintiff flexed his time without submitting leave requests on numerous occasions, (*id*. at 36–37), and did not submit a request to work a reduced schedule. (Dkt. No. 62-10, ¶ 40). He also has numerous instances of tardiness during this period. (Dkt. No. 62-11, at 39–40). Given the staffing needs of Highland, Defendant has advanced legitimate, nondiscriminatory reasons for denying Plaintiff's request for schedule accommodations in March to May of 2015.

### c.    Pretext

Plaintiff's burden at the third stage of the *McDonnell Douglas* burden-shifting analysis is to produce "sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the [defendant] were false, and that more likely than not [discrimination] was the real reason for the [employment action]." *Weinstock*, 224 F.3d at 42 (alterations in original) (quoting *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 714 (2d

Cir. 1996)). In other words, the Court must "now ask whether, without the aid of the presumption" of discrimination raised by the prima face case, the plaintiff "has raised sufficient evidence upon which a reasonable jury could conclude by a preponderance of the evidence that the decision to [take an adverse action] was based, at least in part," on his gender. *Holcomb*, 521 F.3d at 141. "[A] plaintiff may rely on evidence comprising [his] prima facie case, including temporal proximity, together with other evidence such as inconsistent employer explanations, to defeat summary judgment at that stage." *Kwan*, 737 F.3d at 847. Pretext may be shown, inter alia, "by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate" nondiscriminatory reasons for its action. *Id.* at 846.

Plaintiff has not adduced any evidence that the reasons proffered by Defendant for denying him schedule accommodations were false or pretextual. Moreover, Plaintiff's prima facie case for sex discrimination was weak. *See supra* Section IV.A.3.a. While Mallick's previous comment regarding parental leave contributed to an inference of discrimination for the minimal burden of proof at the prima facie stage, this comment occurred five years prior. (Dkt. No. 71-2, ¶ 7). *See Tomassi*, 478 F.3d at 115. Additionally, the initial refusal to adjust Plaintiff's schedule was by Moreno, (Dkt. No. 71-1, at 34), and occurred in response to her discovering that Plaintiff had left the grounds without telling anyone, (Dkt. No. 62-10, ¶ 100), and following her documentation of Plaintiff's history of time and attendance issues. Though Mallick subsequently responded to two of Plaintiff's emails, telling Plaintiff that he could not modify his schedule at will, and encouraging Plaintiff to "file for reasonable accommodations," (Dkt. No. 71-1, at 37, 51), the fact that Mallick did not initiate the refusal and the temporal remoteness of his prior comment undercut any inference of discrimination here.

The legitimate, non-discriminatory reasons proffered by Defendant undercut whether Plaintiff's female co-workers were similarly situated to him, as Plaintiff has not offered any evidence that Moreno, Judge, or Hicks had a similar history of tardiness and attendance problems. Accordingly, the Court grants Defendant summary judgment on Plaintiff's Title VII sex discrimination claim because no reasonable juror could find that, more likely than not, discrimination was the real reason Defendant denied Plaintiff's requested accommodations.

### 4.      Retaliation

Title VII retaliation claims are also analyzed under the *McDonnell Douglas* burden-shifting framework. *See Chen v. City Univ. of N.Y.*, 805 F.3d 59, 74 (2d Cir. 2015); *Davis-Bell v. Columbia Univ.*, 851 F. Supp. 2d 650, 681 (S.D.N.Y. 2012). A plaintiff must first establish the four elements of a prima facie case of retaliation: (1) the plaintiff engaged in protected activity; (2) the defendant was aware of the activity; (3) the defendant took an adverse employment action against the plaintiff; and (4) there is a causal connection between the protected activity and the adverse employment action. *Summa v. Hofstra Univ.*, 708 F.3d 115, 125 (2d Cir. 2013).

The definition of "adverse employment action" in the retaliation context is "not limited to discriminatory actions that affect the terms and conditions of employment," *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64 (2006), but also covers harms that might well have "dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68 (quoting *Washington v. Ill. Dep't of Revenue*, 420 F.3d 658, 662 (7th Cir. 2005)). Under this standard, "[m]aterial adversity is to be determined objectively based on the reactions of a reasonable employee." *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 25 (2d Cir. 2012). The requirement that the employer's action be materially adverse is meant to separate significant from trivial harms. *Burlington N.*, 548 U.S. at 68 ("An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor

annoyances that often take place at work and that all employees experience."). The perspective is that of a reasonable employee because the harm must be assessed objectively. *Id.* Additionally, "alleged acts of retaliation must be evaluated separately and in the aggregate, as even trivial acts may take on greater significance when they are viewed as part of a larger course of conduct." *Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 568 (2d Cir. 2011); *see also Hicks*, 593 F.3d at 165 ("[I]n determining whether conduct amounts to an adverse employment action, the alleged acts of retaliation need to be considered both separately and in the aggregate, as even minor acts of retaliation can be sufficiently 'substantial in gross' as to be actionable.").

As for the causal connection required under Title VII, the plaintiff "must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013). "A causal connection in retaliation claims can be shown either (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Natofsky v. City of New York*, 921 F.3d 337, 353 (2d Cir. 2019) (internal quotation marks omitted).

If the plaintiff establishes a prima facie case, the burden shifts to the employer to demonstrate that a legitimate, nonretaliatory reason existed for its action. *Summa*, 708 F.3d at 129. If the employer demonstrates a legitimate reason for the adverse employment action, the burden shifts back to the employee, and the employee must come forward with evidence that "the non-retaliatory reason is a mere pretext for retaliation." *Kway v. Andalex Group, LLC*, 737 F.3d 834, 845 (2d Cir. 2013). To satisfy that burden, "the plaintiff must demonstrate that there is sufficient evidence for a reasonable juror to find that the reason offered by the defendant is

pretext for retaliation." *Flores v. Entergy Nuclear Operations, Inc.*, 313 F. Supp. 3d 511, 525 (S.D.N.Y. 2018), *aff'd*, 768 F. App'x 139 (2d Cir. 2019). "The temporal proximity of events may give rise to an inference of retaliation for the purposes of establishing a prima facie case of retaliation under Title VII, but without more, such temporal proximity is insufficient to satisfy [the plaintiff's] burden to bring forward some evidence of pretext." *El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010). Pretext may be shown "by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate" nondiscriminatory reasons for its action. *Zann Kwan*, 737 F.3d at 846.

### a.        Plaintiff's Prima Facie Case

### i.        Protected Activity

Plaintiff alleges he engaged in protected activity on the following dates: (1) March 22, 2015, March 25, 2015, and May 28, 2015, when he sent emails to Defendants expressing that he was being discriminated against based on gender, (Dkt. No. 71-1, at 34, 37, 49); (2) June 28, 2015, when he handwrote a note at the bottom of a memo expressing that he was being discriminated against, (Dkt. No. 62-11, at 40); (3) December 2, 2015 when he filed his EEOC Complaint, (Dkt. No. 62-15, at 94); and (4) April 29, 2016, when his attorney wrote a letter to the EEOC about his intent to sue. (Dkt. No. 71-1, at 56–57).

Defendant admits that, for the purposes of its motion, the complaints Plaintiff made in his emails and memo are protected by Title VII. (Dkt. No. 62-24, at 25–26). Defendant does not challenge Plaintiff's contention that his attorney's EEOC letter was protected activity, and so for the purposes of this motion the Court will consider it one.

### ii.        Defendants' Awareness

Defendant acknowledges that "the defendants to whom the e-mails were sent knew of the emails." (Dkt. No. 62-24, at 26 n.4). It also acknowledges that Moreno knew of Plaintiff's June

2015 complaint, but denies that any other Defendants did. (*Id*.). Plaintiff has, however, identified a memo from Moreno to Mallick describing her meeting with Plaintiff and his handwritten note, thus raising an issue of fact as to whether Mallick had knowledge Plaintiff's June 2015 complaint. (Dkt. No. 62-11, at 42; Dkt. No. 62-10, ¶ 44).

Regarding the EEOC complaint, Defendant contends that Mallick learned about it "after this lawsuit was filed," that Judge learned about it in February 2016, that Moreno learned about in March 2016, and that "there is no proof" Lucky learned about the complaint prior to April 29, 2016. (Dkt. No. 62-24, at 26 n.4). However, as Plaintiff makes clear, there are issues of fact regarding whether Mallick and Lucky were aware of the EEOC charge earlier; there is evidence that Judge and Mallick met with an attorney in February 2016 to discuss the EEOC complaint. (Dkt. No. 71-1, at 569–71). Additionally, the privilege logs show that both Mallick and Lucky were emailed by Wilson (the OCFS EODD investigator) about the complaint in March 2016. (Dkt. No. 71-1, at 375–76). As such, Plaintiff has adduced evidence from which it could be inferred that all Defendants were aware of Plaintiff's EEOC complaint no later than March 2016.

### iii.     Retaliatory Actions

Plaintiff alleges the following retaliatory actions were taken against him: "(1) he was investigated and disciplined; (2) he received negative performance evaluations; (3) his work schedule was changed; (4) money was withheld from his paycheck; (5) he was reported to the Justice Center; (6) his unit was inspected; (7) his unit was understaffed; (8) his office was moved," (Dkt. No. 62-24, at 27), (9) he was reassigned to a different facility; (10) he was issued counseling memos; and (11) he was forced to stay overnight during training. (Dkt. No. 72, at 24–29).

Defendant argues that Plaintiff has failed to make out the third (adverse employment action) and fourth (causal connection) elements of a prima facie case of retaliation, and further,

that there were legitimate, nonretaliatory reasons for its actions. (Dkt. No. 62-24, at 26–44). The Court will now analyze each of these alleged retaliatory actions separately.

### (i)    Investigations

Plaintiff was investigated and disciplined six times during the relevant period regarding (1) the iPad incident, (2) attendance issues, (3) the incident with a Highland resident, (4) time sheet inaccuracies, (5) the razor incident, and (6) the EpiPen incident.

### 1.    iPad Investigation

On March 8, 2015, Plaintiff brought an iPad into Highland (which violated existing policies). (Dkt. No. 71-1, at 465; Dkt. No. 62-6, ¶ 82). Moreno interviewed Plaintiff on March 17 and told him he would be receiving a counseling memo. (Dkt. No. 71-2, ¶ 25). Moreno, however, ultimately concluded that Plaintiff should be subject to discipline and submitted her narrative report on March 26, 2015. (Dkt. No. 62-10, ¶¶ 98–99). Judge reviewed this determination and Mallick recommended that Plaintiff be suspended for four months without pay. (Dkt. No. 62-8, ¶ 45; Dkt. No. 70, at 40). Plaintiff grieved this penalty and an arbitrator decided the appropriate penalty was a Letter of Reprimand. (Dkt. No. 62-17, at 52).

Defendant admits that, for the purposes of summary judgment, this investigation and the resulting penalty is an adverse action. (Dkt. No. 62-24, at 27). However, Defendant argues that Plaintiff "cannot establish the necessary causal link between the e-mail complaints" and this investigation, (*id*. at 30), because the investigation took place before the emails.

The Court is unpersuaded. While Moreno interviewed Plaintiff on March 17 (before the first email complaint on March 22), she submitted her report on March 26, 2015. (Dkt. No. 62-10, ¶¶ 98–99). "The causal connection needed for proof of retaliation 'can be established indirectly by showing that the protected activity was closely followed in time by the adverse action.'" *Cifra v. G.E. Co.*, 252 F.3d 205, 217 (2d Cir. 2001) (quoting *Reed v. A.W. Lawrence &*

*Co.*, 95 F.3d 1170, 1178 (2d Cir. 1996)). The temporal proximity between Plaintiff's emails and the recommendation for disciplinary action based on the iPad investigation is thus sufficient to show a causal connection at the summary judgment stage.

Defendant contends that "the investigation of the iPad incident, and its resulting discipline, was based on plaintiff's violation of policy and lack of judgment, and not a retaliatory purpose." (Dkt. No. 62-24, at 35). Plaintiff argues that the arbitrator's decision that a four-month suspension was too severe, coupled with the lack of discipline for the security guard who allowed Plaintiff to bring in the iPad, suggests that this reason is pretextual. (Dkt. No. 72, at 36). The Court agrees this is some evidence from which a jury could infer pretext. Plaintiff has raised a triable issue of fact as to whether a retaliatory motive was a but-for cause of the adverse action. Accordingly, summary judgment is denied as to the iPad investigation.

## 2. Attendance Investigation

While investigating the iPad incident, Moreno discovered that Plaintiff had left the facility on March 9, 2015, without notifying the AOD. (Dkt. No. 62-10, ¶¶ 92, 100). In March 2015, she further investigated Plaintiff's unauthorized leave and schedule adjustments. (*Id.*). Moreno wrote an investigative report and recommended that Plaintiff be disciplined. (Dkt. No. 62-11, at 118). Mallick proposed a one-month suspension without pay. (Dkt. No. 71-1, at 41). OCFS Labor Relations ultimately determined that the evidence did not support discipline, because a number of the unauthorized absences were due to a coding error. (*Id.* at 43). It recommended that Plaintiff be issued a counseling memo. (*Id.*). Plaintiff was issued a formal counseling memo on July 26, 2015. (*Id.* at 209–10). The memo informed Plaintiff that the letter would be filed in his official Personal History Folder. (*Id.* at 209). It also placed him on Medical Documentation status and informed him that "continued abuse could result in other administrative action and/or an unsatisfactory performance rating." (*Id.* at 210).

Defendant contends that this does not constitute an adverse employment action because "such writings are not adverse actions under Title VII." (Dkt. No. 62-24, at 27). Additionally, Defendant argues that "being subjected to investigation that does not result in any harm to the employee . . . is not an adverse action under Title VII." (*Id*. at 27–28).

As for the counseling memos, the Second Circuit has explained that "criticism of an employee (which is part of training and necessary to allow employees to develop, improve and avoid discipline) is not an adverse employment action." *Tepperwien*, 663 F.3d at 570 (quoting *Weeks v. N.Y. State (Div. of Parole)*, 273 F.3d 76, 86 (2d Cir. 2001), *abrogated on other grounds by Morgan*, 536 U.S. at 101). However, in determining that the counseling memo was not an adverse action in *Tepperwien*, the court considered that the memo "did not place [the plaintiff] in an active disciplinary process" because "it confirmed that [the plaintiff] was not in an active 'stepwise' disciplinary process." 663 F.3d at 570. Similarly, in *Weeks*, the Second Circuit found that a counseling memo did not constitute an adverse action because the plaintiff "did not describe its effect or ramifications" or "whether it went into any file." 272 F.3d at 86. As to investigations, in the Second Circuit, fact-finding investigations "consisting only of brief inquiries, and resulting in no discipline" can be considered "merely 'trivial harms' or 'petty slights or minor annoyances.'" *Tepperwien*, 663 F.3d at 570 (quoting *Burlington N.*, 548 U.S. at 68).

In this case, Plaintiff was subjected to an investigation and then issued a formal counseling memo. The memo was placed in his official file and put him on medical documentation status (part of OCFS's three step progressive disciplinary process for unscheduled absences). (Dkt. No. 62-6, ¶ 62). Whether the investigation and resulting formal counseling memo constitute adverse action is a close question. However, "some actions may take

on more or less significance depending on the context," and "even trivial acts may take on greater significance when they are viewed as a larger course of conduct." *Tepperwien*, 663 F.3d at 568. Given that this investigation coincided with the investigation into the iPad, and both occurred shortly after Plaintiff's protected conduct, the Court finds that Plaintiff has adduced enough evidence that the investigation and memo might have "dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N.*, 548 U.S. at 57.

However, even if the investigation and memo are considered adverse actions, Plaintiff must still provide evidence of a causal connection. Like the iPad incident, the investigation into Plaintiff's schedule occurred shortly after his emails, and "temporal proximity can demonstrate a causal nexus." *Slattery v. Swiss Reins. Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001). However, "[w]here timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise." *Id.*

Here, Plaintiff had a history of attendance and tardiness issues. As early as 2012, a co-worker expressed to Mallick that Plaintiff should be removed from serving as AOD because he was not reliable. (Dkt. No. 62-7, at 2). He had previously been on two CAPs to address his attendance issues. (Dkt. No. 62-19, at 109; Dkt. No. 62-10, ¶ 25). He had been issued a warning regarding his unscheduled absences, (Dkt. No. 62-10, ¶ 30), and his previous performance evaluations reflected attendance issues. (Dkt. No. 62-19, at 120). Taking Plaintiff's attendance issues into account, and considering that the impetus for the investigation occurred prior to Plaintiff's email complaints, temporal proximity alone is not enough to demonstrate a causal nexus. As such, Plaintiff has failed to make a prima facie case of retaliation relating to the investigation and discipline of his attendance issues.

Even if temporal proximity were sufficient to raise an inference of retaliation, Plaintiff has failed to adduce evidence of pretext to overcome Defendant's legitimate, non-discriminatory reasons for investigating his attendance issues. *See El Sayed*, 627 F.3d at 933. While the investigation incorrectly calculated the number of unscheduled absences due to a coding error, this is insufficient to demonstrate pretext because "a faulty investigation is not in and of itself evidence of pretext." *Sharpe v. Utica Mut. Ins. Co.*, 756 F. Supp. 2d 230, 250 (N.D.N.Y. 2010); *see also Rodriguez v. City of N.Y.*, 644 F. Supp. 2d 168, 187 (E.D.N.Y. 2008) ("[T]he fact that an employee . . . has evidence that the decision was objectively incorrect or was based on a faulty investigation, does not automatically demonstrate, by itself, that the employer's proffered reasons are a pretext."). Plaintiff has not claimed that the "coding error" was pretextual, and there is no indication that this error was anything other than inadvertent. Accordingly, the Court concludes that Plaintiff has failed to raise a triable issue of fact as to his retaliation claim on this investigation.

### 3. Incident with Highland Resident

Plaintiff was involved in an altercation with a Highland Resident on June 3, 2014. (Dkt. No. 62-17, at 24). On May 6, 2015, Plaintiff was issued a Notice of Discipline relating to the incident, proposing a four-month suspension without pay. (Dkt. No. 71-1, at 53). Plaintiff grieved the notice, and an arbitrator determined he should pay a $1000 fine. (Dkt. No. 62-16, ¶ 19).

That the disciplinary action resulted in a penalty is sufficient to show that it was an adverse employment action. (Dkt. No. 62-24, at 27). Nonetheless, Plaintiff has not alleged facts sufficient to give rise to a causal connection between his protected activity and the adverse action. The incident occurred nine months before Plaintiff's emails in March 2015. After the incident occurred, the Justice Center began an investigation and OCFS then "used the

investigation materials supplied by the Justice Center to assess wrongdoing by [Plaintiff]." (Dkt. No. 62-17, at 26). While OCFS Labor Relations did not issue the Notice of Discipline until May 2015—after Plaintiff's complaints in March 2015—Plaintiff has not provided any evidence that anyone at OCFS Labor Relations knew of Plaintiff's emails before deciding what penalty to impose or that anyone at Highland who was aware of the emails had any influence on the penalty imposed by OCFS Labor Relations.[28] Accordingly, Plaintiff has failed to establish a prima facie case for retaliation regarding the discipline he faced in connection with his altercation with a Highland resident.

### 4. Time Sheet Investigation

On May 18, 2015, Moreno began "an audit of staff timesheets reviewed and submitted by the three YC2's under [her] direct supervision: [P]laintiff, Eric Newton, and Ray Rutland." (Dkt. No. 62-10, ¶ 87). She interrogated Plaintiff and Newton. (*Id*. ¶ 90). Moreno recommended that Plaintiff be disciplined for approving falsified time sheets by staff members he supervised. (*Id*. ¶ 91). On July 22, 2015, Judge sent the investigation to OCFS Labor Relations and recommended that Plaintiff be demoted. (Dkt. No. 71-1, at 192). OCFS Labor Relations "lost the investigation" and "after they discovered it, it was beyond a year. So [Plaintiff] did not get disciplined based on that technicality." (*Id*. at 564). Instead, OCFS Labor Relations directed that Plaintiff received a formal counseling memo in connection to his failure to adhere to Submission of Time and Accrual Records policies. (Dkt. No. 62-9, at 25).

---

[28] Plaintiff also verbally complained of discrimination in February 2014 to Mallick and Judge. (Dkt. No. 71-2, ¶ 13). Even though that activity is time-barred, it can be used as background evidence. To the extent that Mallick's anger at Plaintiff's verbal complaint of discrimination can be construed as establishing a causal nexus, the Court notes that Plaintiff has not offered sufficient evidence of pretext to overcome Defendant's legitimate, non-discriminatory reasons for wanting to discipline an employee who yells "[i]f you hit me, I will kill you" at a resident. (Dkt. No. 62-17, at 24).

As it argued with respect to the investigation into Plaintiff's attendance, Defendant contends that this investigation does not constitute an adverse action because the investigation did not result in any harm to the employee, only a counseling memo. (Dkt. No. 62-24, at 27).

For the same reasons stated *supra* Section IV.A.4.b.iii.i.2, the Court finds the investigation and resulting memo constitute an adverse employment action. Considering the context surrounding the investigation, it might have "dissuaded a reasonable worker from making or supporting a charge of discrimination," *Burlington N*., 548 U.S. at 57. Unlike the attendance investigation, Plaintiff was interrogated as part of the investigation. (Dkt. No 62-10, ¶ 90). He was told by Newton that Moreno had said "don't worry about it, we're only interrogating you so Cusher doesn't cry harassment." (Dkt. No. 71-1, at 432). Shortly after the interrogation, Plaintiff was informed by Tamburro that Mallick had told him that Plaintiff needed to take a demotion at a different facility, or he would be fired. (Dkt. No. 71-2, ¶ 34). Thus, taken together, a reasonable jury could find that the context surrounding the investigation would dissuade a reasonable worker from making a charge of discrimination. *See Eldridge v. Rochester City Sch. Dist*., 968 F. Supp. 2d 546, 560 (W.D.N.Y. 2013) (finding that "the pressure of an internal investigation, coupled with a veiled threat of an involuntary transfer . . . adequately alleges an adverse employment action").

Given that the investigation began less than two months after Plaintiff's emails, temporal proximity provides a causal nexus between Plaintiff's protected activity and the investigation. *See Slattery*, 248 F.3d at 95. Defendant advances legitimate, nonretaliatory reasons for the investigation, arguing that the investigation arose out of a need to "ensure that the timesheets accurately reflected the time that staff worked." (Dkt. No. 62-10, ¶ 88). However, Moreno's insinuation to Newton that she was targeting Cusher, (Dkt. No. 71-1, at 755), combined with

Mallick's statement to Tamburro that Plaintiff "needs to take that position or I'm going to fire his dumb ass," (Dkt. No. 71-1, at 704), is sufficient evidence such that "a reasonable juror [could] find that the reason offered by the defendant is pretext for retaliation." *Flores*, 313 F. Supp. 3d at 525.

### 5. Razor and EpiPen Incidents

During a mock audit of Highland in September 2015, Moreno discovered razors in a secured desk of an employee Plaintiff supervised. (Dkt. No. 62-10, ¶ 115; Dkt. No. 71-1, at 780; Dkt. No. 71-2, ¶ 47). There was no policy regarding the securement of razors. (Dkt. No. 71-1, at 585–86). Moreno concluded that Plaintiff "demonstrates an inability to supervise staff." (Dkt. No. 62-11, at 129). Her report was given to Judge, who recommended to OCFS Labor Relations that Plaintiff be terminated. (Dkt. No. 62-8, ¶ 50).

On September 30, 2015, Plaintiff was given an EpiPen that an employee had misplaced. (Dkt. No. 62-12, ¶ 20). Plaintiff secured the EpiPen but did not tell anyone where it was until the next day. (Dkt. No. 62-13, at 30). Lucky conducted an investigation, and Judge recommended Plaintiff receive a three-month suspension. (Dkt. No. 62-8, ¶ 57). OCFS Labor Relations combined the disciplinary proceedings for these two incidents, and on May 31, 2016 immediately suspended Plaintiff and sought to terminate him. (Dkt. No. 62-9, at 60).

For the purposes of its summary judgment motion, Defendant admits that these investigations resulted in a disciplinary penalty and amount to adverse actions. (Dkt. No. 62-24, at 27). Regarding causation, Judge submitted the investigations to OCFS on October 20, 2015 for the razor incident, (Dkt. No. 71-1, at 220), and January 14, 2016 for the EpiPen incident. (*Id*. at 241). Plaintiff's most recent protected activity (of which Defendants were aware) was his

handwritten allegation of discrimination on June 28, 2015.[29] Construing all facts in the light most favorable to Plaintiff, the Court finds that, for Plaintiff's prima facie case, there is sufficient temporal proximity to establish a causal nexus. *See Gorman-Bakos v. Cornell Co-op Extension of Schenectady Cty.*, 252 F.3d 545, 555 (2d Cir. 2001) (holding that temporal proximity of four months "is sufficient to support an allegation of a causal connection strong enough to survive a summary judgment motion"); *see also Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010) ("Though this Court has not drawn a bright line defining, for the purposes of a prima facie case, the outer limits beyond which a temporal relationship is too attenuated to establish causation, we have previously held that five months is not too long to find the causal relationship.").

Defendant advances legitimate, non-discriminatory reasons for investigating and disciplining Plaintiff. Specifically, it contends that Plaintiff was disciplined for the razor incident because of his "violation of policy and lack of judgment." (Dkt. No. 62-24, at 37). Similarly, for the EpiPen incident, it claims that "plaintiff's conduct violated policy." (*Id.* at 38).

Plaintiff alleges that there is direct and indirect evidence of retaliatory animus, suggesting that the reasons advanced by Defendant are pretextual. (Dkt. No. 72, at 30–41). First, Plaintiff alleges there is evidence in the record to support Mallick's retaliatory animus. In 2014, when Plaintiff first complained of discrimination, Mallick became angry and shouted at him. (Dkt. No. 71-2, ¶ 15). Additionally, in response to one of Plaintiff's 2015 allegations of discrimination, Mallick wrote that if Plaintiff "spent more time on [his] job and [his] task and standards [he] would be a more productive employee" and that Mallick was "tired" of seeing Plaintiff's emails

---

[29] The report on the EpiPen incident was submitted after Plaintiff filed his EEOC charge. (Dkt. No. 62-15, at 94). However, Plaintiff has not offered evidence that any Defendants were aware of the charge prior to January 14, 2016.

"attacking female employees." (Dkt. No. 71-1, at 51). Mallick also told Tamburro that if Plaintiff

did not take a demotion, he "would fire his dumb ass." (Dkt. No. 71-1, at 704). "[A]n employer's

anger at its employee for engaging in a protected activity may well constitute direct causal

evidence." *Delville v. Firmenich Inc.*, 920 F. Supp. 2d 446, 466 (S.D.N.Y. 2013); *see also*

*Martin v. State Univ. of New York*, 704 F. Supp. 2d 202, 233 (E.D.N.Y. 2010) (denying summary

judgment where the employer's anger raised "sufficient questions as to whether an unlawful

retaliatory motive" caused the adverse action).[30] However, Plaintiff has failed to offer any

evidence to rebut Mallick's testimony that he "had no involvement with the NOD's served on

plaintiff in connection with the . . . razor, and epi-pen incidents." (Dkt. No. 62-6, ¶ 76). The

Court notes, however, that as Facility Manager Mallick supervised Judge. (*Id.* ¶ 6).

Second, Plaintiff alleges that "there were other employees who were deficient and they

were not subjected to discipline." (Dkt. No. 72, at 32). Specifically, during the mock audit that

uncovered the razors, it was discovered that another employee had been falsifying fire

extinguisher records. (Dkt. No. 71-1, at 595). He was issued a counseling memo. (*Id.* at 596).

Regarding the EpiPen incident, the employee who misplaced the EpiPen was not interrogated or

disciplined. (Dkt. No. 71-1, at 684). "Pretext and intent may be demonstrated by . . . comparative

treatment of other similarly situated employees." *Trujillo v. Inter-Cont'l Hotels Corp.*, No. 96-

cv-5789, 1997 WL 466545, at *4, 1997 U.S. Dist. LEXIS 11986, at *13 (S.D.N.Y. Aug. 13,

1997); *see also Gorzynski*, 596 F.3d at 108 (noting that the failure to discipline similarly situated

employees can be "evidence that the reasons given by [the employer] were pretextual," even if

the employees were not in the same role).

---

[30] It is for the jury to determine whether Mallick's alleged anger was founded on Plaintiff's poor job performance or on his reporting of possible discrimination. *See Martin*, 704 F. Supp. 2d at 231 n.19.

Third, regarding the razor incident, Plaintiff argues that Defendant's explanation is pretextual because there was no explicit policy in place at Highland when the razors were discovered. (Dkt. No. 72, at 37–38). The local policy did not go into effect until after the incident. (Dkt. No. 71-1, at 217). Thus, Plaintiff has provided some evidence from which pretext may be inferred. *See Summa*, 708 F.3d at 129–30 (denying summary judgment because, inter alia, the plaintiff offered evidence disproving factual elements of the defendant's legitimate rationale for the adverse action).

As such, viewing all evidence in the light most favorable to Plaintiff, the Court concludes that he has adduced enough evidence to survive summary judgment. Considering all of the evidence, the Court finds a genuine dispute of material fact as to whether Plaintiff's complaints of discrimination were the but-for cause of the investigations into and discipline of Plaintiff for the razor and EpiPen incidents.

### (ii)      Performance Evaluations

In June 2015, Moreno issued Plaintiff a negative performance evaluation in which he received an unsatisfactory rating in six out of seven areas. (Dkt. No. 62-11, at 83–86). In June 2016, Lucky issued Plaintiff a negative performance evaluation in which he was given an unsatisfactory in five of eight areas. (Dkt. No. 62-12, ¶ 35; Dkt. No. 62-13, at 45–50). In June 2017, Lucky issued Plaintiff a negative performance evaluation in which he gave him an "unsatisfactory" in all areas, despite the fact that Plaintiff had not worked during this time period and "N/A" was an option. (Dkt. No. 71-1, at 331–32).

Defendant assumes these performance evaluations were adverse employment actions. (Dkt. No. 62-24, at 27). However, Defendant contends that Plaintiff cannot establish a causal link between Plaintiff's protected activity and his performance evaluations. (*Id*. at 30). The June 2015 evaluation came approximately one month after Plaintiff's May 28, 2015 email. The June

2016 evaluation came approximately 3 months after Defendants learned about the EEOC investigation and approximately 2 months after they received Plaintiff's attorney's letter. The June 2017 evaluation, however, was more than a year after his protected activity, and therefore lacks temporal proximity. As such, Plaintiff has failed to put forth a prima facie case for retaliation regarding the 2017 performance evaluation.

Though the 2015 and 2016 performance evaluations were temporally proximate to Plaintiff's protected activities, Defendant argues this fails to establish a causal nexus because "the reasons that plaintiff received negative reviews of his job performance were previously present, and documented, plaintiff cannot infer a causal connection between any complaint and any subsequent review or correspondence based on temporal proximity." (Dkt. No. 62-24, at 33). "Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise." *Slattery*, 248 F.3d at 95. As discussed *supra* Section IV.A.4.b.iii.i.2, Plaintiff had a history of work performance issues that predated his protected activity.

However, timing is not the only basis on which Plaintiff alleges a causal connection. In 2015, he contends that there is evidence that Mallick held a retaliatory animus towards him, as evidenced by Mallick's comments about his work performance in response to his complaints about discrimination and threat to fire him. Both of these incidents occurred shortly before the performance evaluation, which Mallick reviewed. (Dkt. No. 62-10, ¶ 75). Additionally, in 2015, Moreno told Plaintiff he was doing an "excellent job," but then rated him as unsatisfactory in six out of seven areas. (Dkt. No. 71-2, ¶ 39; Dkt. No. 62-11, at 83–86). Moreno then told Plaintiff she would change his evaluation because she "made some mistakes in 'judgment,'" (Dkt. No. 71-2, ¶ 42), changed his evaluation, and then changed it back. (Dkt. No. 62-11, at 88–91; Dkt.

No. 62-10, ¶ 77). In 2016, Plaintiff alleges that in response to his EEOC investigation and lawsuit, Lucky subjected him to a barrage of counseling memos, moved his office, and subjected him to scrutiny. The Court therefore finds that, in addition to temporal proximity, the evidence of retaliatory animus proffered by Plaintiff establishes a sufficient causal nexus at this stage.

Defendant offers legitimate, nondiscriminatory reasons for Plaintiff's performance evaluations, because he had problems regarding "time and attendance of himself and staff, holding employees accountable; complying with and enforcing OCFS and Highland policies; and engaging in disrespectful and unprofessional correspondence with management." (Dkt. No. 62-24, at 33). Whether Plaintiff has made a sufficient showing of pretext is a close question, considering his documented performance problems regarding attendance that predated his complaints. However, when considering his evidence of retaliatory animus, combined with the fact that the performance evaluations go beyond the attendance issues, the Court concludes that he has adduced enough evidence of pretext—although just barely—to survive summary judgment regarding his 2015 and 2016 evaluations.

### (iii) May 2015 Work Schedule Change

In the Complaint, Plaintiff alleged that on May 7, 2015, he was served "with a memorandum changing his schedule." (Dkt. No. 1, ¶ 26). However, as Defendant argues, "that allegation is contrary to the evidence." (Dkt. No. 62-24, at 40). Plaintiff had been assigned to that schedule since February 1, 2015. (Dkt. No. 62-10, ¶ 35). Moreno had allowed him to adjust his schedule in March and April in an effort to accommodate him, with the understanding he would submit a request for a Reduced Work Schedule. (*Id*. ¶ 37). Plaintiff failed to submit such a request, so he was required to work his scheduled hours. (*Id*. ¶ 40). Thus, the record does not support his schedule was changed.

Furthermore, in his opposition to summary judgment, Plaintiff does not address Defendant's argument that his work schedule was not changed in May 2015 and Moreno's decision to require him to work his assigned schedule arose out of legitimate, nondiscriminatory concerns. (Dkt. No. 62-24, at 40). As such, the Court considers the claim relating to this scheduling change abandoned. *See Iron Workers Local No. 60 Annuity Pension Fund ex rel. Robb v. Solvay Iron Works, Inc.*, No. 15-cv-54, 2018 WL 2185510, at *15, 2018 U.S. Dist. LEXIS 79735, at *41 (N.D.N.Y. May 11, 2018); *see also Taylor v. City of New York*, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003) ("Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way.").

### (iv)      Paycheck

In June 2015, due to an error, Plaintiff's paycheck was missing money. (Dkt. No. 71-2, ¶ 44). Mallick helped to arrange for a salary advance. (Dkt. No. 62-6, ¶ 86). Defendant argues that this does not constitute an adverse action. (Dkt. No. 62-24, at 27). The Court agrees. Courts have found that "[a] delay in payment is not an adverse employment action." *Spaulding v. N. Y. City Dep't of Educ.*, No. 12-cv-3041, 2015 WL 12645530, at *40, 2015 U.S. Dist. LEXIS 127076, at *135 (E.D.N.Y. Feb. 19, 2015); *see also Delia v. Donahoe*, 862 F. Supp. 2d 196, 212 (E.D.N.Y. 2012) (noting that when pay is erroneously withheld and then restored, the "allegation is the sort of *de minimis* personnel matter that courts have dismissed as not constituting adverse employment actions" (quoting *Blake v. Potter*, 2007 WL 2815637, at *6, 2007 U.S. Dist. LEXIS 72703, at *22 (S.D.N.Y. Sept. 25, 2007) (citation omitted))).

Even when viewed in the aggregate with the other adverse actions that Plaintiff alleges, the Court finds that this incident was a *de minimis* personnel matter that does not rise to the level

of an adverse action. Accordingly, the Court find that Plaintiff has failed to establish a prima facie case for this claim.

(v) <b>Justice Center Investigation</b>

At some point prior to March 15, 2016, Plaintiff was reported to the Justice Center for failing to report allegations that a Highland Resident had made against a staff member. (Dkt. No. 71-2, ¶¶ 69–72). He was interrogated but not found guilty of any wrongdoing. (*Id.* ¶ 72).

Defendant argues that this does not constitute an adverse action because "it did not result in any harm to the [plaintiff]." (Dkt. No. 62-24, at 27). The Court agrees. Even viewed in the light most favorable to Plaintiff, being interviewed, without any resulting discipline, is a "merely 'trivial harm[]' or '[a] petty slight[] or minor annoyance[]." *Burlington N.*, 548 U.S. at 68; *Tepperwien*, 663 F.3d at 570. It does not rise to the level of an adverse employment action because it would not deter a reasonable worker from engaging in protected activity.

Furthermore, even if it were considered an adverse action, Plaintiff has presented no evidence regarding who made the report to the Justice Center. He alleges it was Lucky "upon information and belief" alone, which the Court does not credit. *See supra* Section II.B.4.d. Therefore, Plaintiff fails to present evidence that connects the report to anyone who was aware of his protected activity and cannot establish a causal nexus between his protected activity and being reported. Accordingly, the Court finds Plaintiff has failed to establish a prima facie case of retaliation for this claim.

(vi) <b>Unit Inspection and Office Change</b>

On March 16, 2016, Mallick and Lucky conducted an unscheduled inspection of Plaintiff's unit. (Dkt. No. 71-2, ¶¶ 62, 109; Dkt. No. 62-12, ¶ 23). Mallick instructed Lucky to check the unit daily going forward, which he did. (Dkt. No. 71-2, ¶¶ 62–63). Lucky issued several supervisory memoranda in which he highlighted areas where Plaintiff could improve his

work performance. (Dkt. No. 62-13, at 11–28). On April 21, 2016, Lucky directed Plaintiff to move from a larger office into a smaller one "the size of a closet." (Dkt. No. 71-2, ¶ 76; Dkt. No. 62-13, at 91).

Defendant contends that the inspections and supervisory memos were "close scrutiny of job duties . . . without any attendant harm" and therefore do not rise to the level of an adverse employment actions. (Dkt. No. 62-24, at 28). Additionally, Defendant argues that the office change was not an adverse action. (Dkt. No. 62-24, at 27).

As Defendant contends, "an employer's excessive scrutiny of an employee, without more, fails to satisfy the requirements for an adverse employment action." *Nagle v. E. Greenbush Cent. Sch. Dist.*, No. 116-cv-00214, 2018 WL 4214362, at *19, 2018 U.S. Dist. LEXIS 153990, at *51 (N.D.N.Y. Feb. 21, 2018) (quoting *Dotson v. City of Syracuse*, No. 04-cv-1388, 2009 WL 2176127, at *18, 2009 U.S. Dist. LEXIS 62174, at *52 (N.D.N.Y. July 21, 2009)); *see also Nicastro v. Runyon*, 60 F. Supp. 2d 181, 186 (S.D.N.Y. 1999) (finding that excessive scrutiny does not constitute an adverse employment action). Regarding the supervisory memos, the Second Circuit has explained that "criticism of an employee (which is part of training and necessary to allow employees to develop, improve and avoid discipline) is not an adverse employment action." *Tepperwien*, 663 F.3d at 570 (quoting *Weeks*, 273 F.3d at 86). Furthermore, at least one court has found that relocating an employee's office is not an adverse action. *See Moccio v. Cornell Univ.*, 889 F. Supp. 2d 539, 586 (S.D.N.Y. 2012) (assignment to a "different, allegedly inferior, office space" did not rise to the level of an adverse action).

Viewing these instances discretely, none individually rises to the level of an adverse action. However, "even minor acts of retaliation can be sufficiently 'substantial in gross' as to be actionable." *Hicks*, 593 F.3d at 165. The key question is whether these actions, in the aggregate,

could "dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington N.*, 548 U.S. at 57. Taken together, the Court finds that the unit inspections, excessive scrutiny, and office change to an inferior room could "deter a similarly situated individual of ordinary firmness from exercising his . . . rights." *Hoyt v. Andreucci*, 433 F.3d 320, 328 (2d Cir. 2006) (quoting *Washington v. Cty. of Rockland*, 373 F.3d 310, 320 (2d Cir. 2004) (internal quotation marks omitted)); *see also Bowen-Hooks v. City of New York*, 13 F. Supp. 3d 179, 228 (E.D.N.Y. 2014) (holding that "atypical scrutiny and written criticism" could constitute adverse employments actions when viewed in the aggregate). Accordingly, the third prong of Plaintiff's prima facie case is fulfilled.

The unit inspections began almost immediately after Defendants became aware of Plaintiff's EEOC complaint, (Dkt. No. 71-1, at 379), and Plaintiff was forced to move office about a month later. (Dkt. No. 62-13, at 91). Plaintiff was subjected to excessive scrutiny by Lucky, as evidenced by the unit inspections and supervisory memos, in the intervening month. (*Id.* at 11–28). The temporal proximity of these actions to Defendants learning of Plaintiff's EEOC complaint establishes a causal nexus.

Defendant advances legitimate, nonretaliatory reasons for these actions. Regarding the unit inspections, Defendant contends that "[a]s Associate Commissioner, defendant Mallick made routine inspections of the facilities under his supervision," (Dkt. No. 62-24, at 41), and "it was part of defendant Lucky's job duties to inspect and monitor plaintiff's work areas, and any such monitoring by defendant Lucky was done in furtherance of his duties." (*Id.*). Regarding the office change, Plaintiff had expressed his unit was understaffed due to a staff member who was on "no unsupervised kid contact" status. (Dkt. No. 62-12, ¶¶ 50–51). In order to rectify the

problem, Lucky moved Plaintiff from a more remote office location to an office that was more central in his unit. (*Id.*).

Other than temporal proximity, Plaintiff has not provided any evidence of pretext that "demonstrate[s] weaknesses, implausibilities, inconsistencies, or contradictions" in the decision to move his office to address understaffing concerns in his unit. *Zann Kwan*, 737 F.3d at 846–47 ("Temporal proximity alone is insufficient to defeat summary judgment at the pretext stage.") Plaintiff has thus failed to show that a reasonable juror could conclude that but-for Plaintiff's EEOC complaint, his office would not have been moved, and so the Court issues summary judgment in Defendant's favor on this claim.

Regarding the unit inspections and excessive scrutiny, however, Plaintiff has provided sufficient evidence of pretext. First, Plaintiff's unit had a malfunctioning mechanical air handler that was causing debris in the hallways. (Dkt. No. 71-1, at 747–48). Tamburro informed Lucky that was why Plaintiff's unit looked unclean, and in response, Lucky replied "[Plaintiff's] not keeping the unit clean." (*Id.* at 748). A reasonable juror could view this response as evidence of pretext, because it demonstrates the weakness of Lucky's rationale for excessive monitoring of the unit and supervisory memos. Second, unlike the office change, Mallick was involved in instigating the excessive scrutiny of Plaintiff, and Plaintiff has provided evidence of his retaliatory animus. *See supra* Section IV.A.4.b.iii.i.b. Though the evidence of Mallick's animus occurred in 2015, a reasonable jury could infer that Mallick still harbored animus toward Plaintiff during this time period. Accordingly, the Court denies summary judgment on this claim.

### (vii) Unit Understaffing

Lucky "reduced the number of employees in [Plaintiff's] unit from three to two per shift making it impossible for staff to perform the work required." (Dkt. No. 71-2, ¶ 67). Specifically, Plaintiff asserts that this reduction created a problem because it meant a staff member who had a

"no unsupervised contact with residents" restriction would be left alone with a number of residents. (*Id*. ¶ 68). Reducing the staff in Plaintiff's unit does not rise to the level of an adverse action. *See Burlington N*., 548 U.S. at 68 ("An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience."). As Defendant notes, Plaintiff does not allege that the staff reduction caused him any harm. (Dkt. No. 62-24, at 28). Thus, a reasonable employee would not be dissuaded from "making or supporting a charge of discrimination." *See Burlington N*., 548 U.S. at 57.

### (viii)    Reassignment

When returning to work in 2017, Plaintiff was assigned to work at Brookwood rather than Highland. (Dkt. No. 62-3, at 150–151). Brookwood is farther from his home. (*Id*. at 151–52). Plaintiff grieved this placement, and his grievance was upheld. (*Id*. at 151). He was then assigned to return to Highland. (*Id*.).

Assuming *arguendo* that Plaintiff's reassignment constitutes an adverse employment action, Plaintiff has failed to provide sufficient evidence of a causal nexus between his protected activity and his reassignment. His last protected activity, the letter from his attorney, occurred in April 2016 (over a year prior). Temporal proximity therefore does not establish a causal nexus. Nor has Plaintiff identified any evidence of retaliatory animus in connection with this decision. As such, Plaintiff has failed to establish a prima facie case of retaliation relating to his reassignment.

### (ix)    Training

Once Plaintiff returned to work in 2017, he was required to attend overnight training. (Dkt. No. 71-1, at 326). He was issued two counseling memos on his first day. He arrived at the academy late. (*Id*.). One confirmed he had been given permission to leave the academy at certain

times to care for his son. (Dkt. No. 71-1, at 328). The other reiterated that he needed to be at the facility on time. (*Id*. at 326). Plaintiff contends that he was forced to stay at the facility overnight "despite the fact that employees had not been required to do so previously." (Dkt. No. 71-2, ¶ 84).

The counseling memos do not rise to the level of an adverse action because although they were placed in his "Personal History File," there is no indication they were disciplinary in nature. (Dkt. No. 71-1, at 326, 328). *See Tepperwien*, 663 F.3d at 570; *Orsaio v. New York State Dep't of Corr. & Cmty. Supervision*, No. 617-cv-00685, 2019 WL 3891085, at *27, 2019 U.S. Dist. LEXIS 139745, at *78 (N.D.N.Y. Aug. 19, 2019) (finding that counseling memos were not adverse actions when there was no evidence that they were "of a disciplinary nature"). Accordingly, they cannot form the basis for a retaliation claim under Title VII.

Assuming *arguendo* that the requirement to stay overnight is materially adverse, Plaintiff has failed to establish a causal nexus between his protected activity and the requirement. As discussed *supra* Section IV.A.4.b.iii.ix, it was approximately a year after his last protected activity, thus there is no basis for a finding of temporal proximity to his last instance of protected activity, and Plaintiff has not provided any evidence of similarly situated individuals who were not required to stay overnight or other evidence of retaliatory animus. As such, summary judgment is granted, and this claim is dismissed.

### B.      Fourteenth Amendment

Plaintiff brings claims under § 1983 against Defendants Mallick, Judge, Moreno and Lucky. (Dkt. No. 1, ¶¶ 59, 61). He alleges violations of the Equal Protection Clause for (1) discriminating on the basis of sex and (2) retaliating against him for complaining of sex discrimination. (*Id.*; Dkt. No. 72, at 42–43).

Unlike his Title VII claims against OCFS, here, Plaintiff sues Mallick, Judge, Moreno, and Lucky in their individual capacities. "[A] defendant in a § 1983 action may not be held liable for damages for constitutional violations merely because he held a high position of authority." *Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996). "Rather, the 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'" *Victory v. Pataki*, 814 F.3d 47, 67 (2d Cir. 2016) (quoting *Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir. 2006)); *see also Warren v. Pataki*, 823 F.3d 125, 136 (2d Cir. 2016); *Littlejohn v. City of New York*, 795 F.3d 297, 314 (2d Cir. 2015). "[S]upervisor liability in a § 1983 action depends on a showing of some personal responsibility, and cannot rest on *respondeat superior*." *Hernandez v. Keane*, 341 F.3d 137, 144 (2d Cir. 2003).[31]

### 1.    Equal Protection Sex Discrimination Claim

Defendants move for summary judgment on Plaintiff's sex discrimination equal protection claim, which he brings under § 1983 against Mallick, Judge, Moreno, and Lucky, (*see* Dkt. No. 1, ¶ 59), on the same grounds that Plaintiff's Title VII claim should be dismissed. (Dkt. No. 62-24, at 45–46).

Defendants contend that a violation of the Equal Protection Clause of the U.S. Constitution is analyzed with the same burden shifting analysis as Title VII claims. (*See* Dkt. No. 62-24, at 45 (citing *Back v. Hastings on Hudson Free Sch. Dist.*, 365 F.2d 107, 122 (2d Cir. 2004)). However, a recent decision by the Second Circuit (decided after briefing in this case was complete) clarified that, while "§ 1983 discrimination claims parallel Title VII discrimination claims in many respects," a "crucial distinction between" them is "the required degree of

---

[31] Plaintiff alleges liability based on direct participation; the parties have not raised the issue of supervisor liability and thus the Court does not discuss it here.

causation." *Naumovski v. Norris*, 934 F.3d 200, 213 (2d Cir. 2019). Title VII has a "lessened causation standard" because litigants "may succeed simply be establishing that sex (or another protected characteristic) was a 'motivating factor for any employment practice, even though other factors also motivated the practice.'" *Id.* (quoting *Nassar*, 570 U.S. at 349). However, "a plaintiff pursuing a claim for employment discrimination under § 1983 rather than Title VII must establish that the defendant's discriminatory intent was a 'but-for' cause of the adverse employment action." *Id.* at 214.

Plaintiff alleges two instances of sex discrimination: (1) his schedule was changed in early 2014 and Defendants refused to accommodate him and (2) his schedule needs were not accommodated in March to May 2015. (Dkt. No. 72, at 43–44).[32] The Court's Title VII analysis pertaining to the circumstances surrounding Plaintiff's 2015 schedule applies here.[33] *See supra* Section IV.A.3. Accordingly, Defendants' failure to accommodate his schedule in 2015 cannot serve as the basis of a § 1983 discrimination claim. The Court therefore solely analyzes Plaintiff's claims regarding the 2014 schedule change and refusal of accommodations.

### a.    Prima Facie Case

Plaintiff must show that (1) he is a member of a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to an inference of discrimination. *Bennett*, 842 F. Supp. 2d at 497 (citing *Leibowitz*, 584 F.3d at 491–92). There is no dispute that the first two prongs are satisfied. Defendants apparently concede that the schedule change constitutes an

---

[32] Any discrimination claim regarding Plaintiff's paternity leave is time-barred, which Plaintiff admits. (Dkt. No. 72, at 43).

[33] The Court notes that its analysis pertaining to pretext was subject to a "lessened causation standard," *Naumovski*, 934 F.3d at 213, under which the Plaintiff only needed to show that sex was a motivating factor. Plaintiff failed to do so, and thus similarly fails under the heightened causation standard articulated in *Naumovski*. *Id.* at 214.

adverse employment action in the sex discrimination context, (*See* Dkt. No. 62-24, at 20–22, 45–46), and thus for the purposes of this motion the Court will assume this prong is satisfied.

The Court therefore focuses its analysis on whether the surrounding circumstances give rise to an inference that Plaintiff's schedule change arose out of gender discrimination. In February 2014, Plaintiff's schedule was changed to four ten-hour shifts. (Dkt. No. 62-6, ¶ 17). He alleges that when he requested his schedule be accommodated because of his childcare responsibilities, Mallick, Judge, and Moreno denied his requests. (Dkt. No. 62-3, at 66–67; Dkt. No. 71-2, ¶ 10). Specifically, Plaintiff had a conversation with Mallick in which he told Mallick the new schedule was a "hardship" for him, and then requested a temporary accommodation in connection with his new work schedule. (Dkt. No. 62-3, at 65–67, 155–56).[34] It is unclear whether Plaintiff claims that both the schedule change and the refusal to accommodate him constitute discrimination, so the Court will construe his claim of sex discrimination to include both.

### i. Discriminatory Intent

Plaintiff contends that there is evidence of discriminatory intent because Mallick previously expressed "discriminatory views on who should be taking time off to rear children," (Dkt. No. 72, at 43), and he "became visibly angry and started shouting" when Plaintiff observed disparate treatment. (*Id*.). Additionally, when Plaintiff informed Mallick he could not work his new schedule, Mallick "told him he should resign." (*Id*. at 44). Plaintiff has presented no evidence from which a reasonable factfinder could conclude that Moreno and Judge had any discriminatory intent.

---

[34] The Court notes that Plaintiff also requested a schedule accommodation in October 2014, and this request was granted for one month. (Dkt. No. 62-10, ¶ 32).

### ii.     Disparate Treatment

Additionally, Plaintiff argues that similarly situated female co-workers "ha[d] their hours adjusted in order to care for their children," giving rise to an inference of discrimination. (*Id*. at 43). As previously discussed, Plaintiff's statements that female employees who were mothers were routinely accommodated, and he was not, (Dkt. No. 71-2, ¶¶ 12–13), are conclusory and vague and do not give rise to an inference of discrimination. *See Holcomb*, 521 F.3d at 137. The only evidence during 2014 Plaintiff has offered to corroborate his claims is that he observed that Judge did not always work her required late night hours. (Dkt. No. 71-2, ¶ 15).[35] However, Judge was an Assistant Director during this time period, (Dkt. No. 62-8, ¶ 4), and there is no evidence in the record that suggests that Assistant Directors were required to serve as AODs.

### iii.     Personal Involvement

The alleged accommodation of Judge's schedule cannot be attributed to Judge herself or Moreno, who was not her supervisor. As such, there is no evidence in the record that gives rise to an inference of discrimination on behalf of Moreno or Judge. Additionally, Plaintiff has not provided any evidence of Lucky's involvement in 2014. The equal protection sex discrimination claims against Judge, Moreno, and Lucky are therefore dismissed. *See Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) ("[I]t is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.") (citation and internal quotation marks omitted).

Mallick had control over Judge's schedule. (Dkt. No. 62-6, ¶ 44). Mallick also made the decision to change Plaintiff's schedule. (Dkt. No. 62-24, at 45–46). Additionally, though

---

[35] The Court notes that, at some point, Mallick appointed Judge to be the "point person" for the Justice Center and her hours were adjusted to work 9:00 am to 5:00 pm. (Dkt. No. 62-6, ¶ 44). However, there is no evidence when the shift to Judge's job duties and schedule took place. As such, construing the evidence in the light most favorable to Plaintiff, the Court assumes that Judge was scheduled to work some late shifts in this time period.

Defendants argue that Mallick "w[as] not personally involved in denying plaintiff work schedule adjustments in March 2014," (Dkt. No. 62-24, at 46), evidence in the record suggests that Plaintiff spoke with Mallick about the hardship his new schedule was causing him. (Dkt. No. 62-3, at 155–56). Mallick proposed that Plaintiff resign rather than accommodating him. (*Id*.).

Given Mallick's personal involvement, Plaintiff has adduced sufficient evidence—albeit barely—such that a reasonable jury could find that the adverse action took place under circumstances giving rise to an inference of discrimination. The evidence regarding Mallick's alleged discriminatory and retaliatory animus, combined with some evidence of disparate treatment of Judge, is thus enough to establish a prima facie case of sex discrimination against Mallick.

b.    **Nondiscriminatory Reasons**

Mallick advances legitimate, nondiscriminatory reasons for changing Plaintiff's schedule and requiring him to adhere to it. (Dkt. No. 62-24, at 45–46). In 2013, "the Justice Center was created by the State of New York to receive and investigate allegations of abuse of vulnerable persons who receive care from OCFS." (Dkt. No. 62-6, ¶ 43). In response, Mallick and the administrative team at Highland were "concerned with its new reporting requirement and so it was decided that YC2's should serve as AOD's instead of YC1's." (*Id*. ¶ 14). Mallick determined that "the needs of Highland were best served by having more experienced staff in AOD positions." (*Id*. ¶ 19). YC2s, including Plaintiff, bid for shifts based on seniority, and Plaintiff (the least senior) ended up with four late-nights shifts. (*Id*. ¶¶ 14–16; Dkt. No. 71-2, ¶ 16). Therefore, the burden shifts back to Plaintiff to show that legitimate reasons behind the shift changes were pretextual.

###### c.        Pretext

At the third stage of the *McDonnell Douglas* burden-shifting analysis for § 1983 sex discrimination claims, the plaintiff "must establish that the employer's stated reason would not, alone, constitute a sufficient basis for pursuing an adverse action. In other words, a § 1983 plaintiff must establish that the employer's stated non-discriminatory reason is either false or inadequate to support the adverse employment action." *Naumovski*, 934 F.3d at 214.

Plaintiff falls far short of this standard.[36] Plaintiff does not offer evidence that Mallick's articulated reasons for changing his schedule and needing him and the other YC2s to work scheduled shifts as AODs is either "false or inadequate." *Id.* The evidence of Mallick's discriminatory views about gender and childcare is remote, having occurred four years prior. Furthermore, Plaintiff admits that Judge held a different position and did not have the same "tasks and standards" as he did as a YC2, which required him to serve as AOD. (Dkt. No. 62-3, at 77). He also offers no evidence that Judge had the same history of time and attendance issues as Plaintiff. *See supra* Section IV.A.3.b. Plaintiff's evidence of disparate treatment is therefore weak and fails to show that "but-for" Mallick's discriminatory views Plaintiff's schedule would not have been changed or he would have been allowed to not adhere to his scheduled hours. Accordingly, as Plaintiff has failed to raise a material issue of fact with respect to his discrimination claims, Defendants are entitled to summary judgment dismissing this claim.

##### 2.        Equal Protection Retaliation Claim

In the Second Circuit, "a claim for retaliation for a complaint that alleged discrimination is actionable under § 1983" because "retaliation is a form of discrimination." *Vega*, 801 F.3d at 81. Plaintiff alleges that Mallick, Judge, Moreno and Lucky "violated [Plaintiff's] right to equal

---

[36] The Court notes that even if Title VII's more lenient causation standard applied, Plaintiff has not adduced sufficient evidence that sex was a "motivating factor" in the adverse action. *See Holcomb*, 521 F.3d at 138.

protection by . . . retaliating against him because he complained of discrimination." (Dkt. No. 72, at 43).[37]

"[T]he elements of a retaliation claim based on an equal protection violation under § 1983 mirror those under Title VII." *Vega*, 801 F.3d at 91. As such, the Court issues summary judgment in favor of Defendants, for the reasons described *supra* Section IV.A.4, regarding the: (1) attendance investigation, (2) investigation of the incident with the Highland resident, (3) May 2015 work schedule change, (4) paycheck incident, (5) Justice Center investigation, (6) unit understaffing, (7) office move, (8) reassignment, and (9) issues during training. The following retaliation claims survive summary judgment: (1) iPad investigation, (2) time sheet investigation, (3) the razor and EpiPen investigations, (4) 2015 and 2016 performance evaluations, and (5) unit inspections and excessive scrutiny.[38]

### 3. Qualified Immunity

Defendants contend that they are entitled to qualified immunity because "[b]ased on the law as it existed at the time of the incidents alleged in the complaint, it was reasonable for the individual defendants to believe that none of their actions violated plaintiff's constitutional rights." (Dkt. No. 62-24, at 49).

At the summary judgment stage, claims of qualified immunity are evaluated "using a two-part inquiry: (1) whether the facts, taken in the light most favorable to the party asserting the

---

[37] In their motion for summary judgment, Defendants interpreted the Fourteenth Amendment cause of action as pertaining to a violation of the equal protection clause by discriminating on the basis of sex. (Dkt. No. 62-24, at 12, 45). While the Complaint raises one cause of action under the Fourteenth Amendment, the Complaint repeatedly alleges both discrimination and retaliation. (Dkt.No.1 ¶¶ 15, 19, 53, 59). In Plaintiff's opposition, he argues that he is bringing equal protection claims for discrimination and retaliation. (Dkt. No. 72, at 42–43). Defendants failed to respond to that argument. (Dkt. No. 79-3).

[38] In light of the Defendants' failure to address Plaintiff's § 1983 equal protection retaliation claims, the Court was not given a basis for evaluating whether the individual Defendants had personal involvement in the alleged instances of retaliation. There is therefore no basis to dismiss the remaining claims against Mallick, Judge, Moreno, and Lucky.

injury show that the officer's conduct violated a federal right" and (2) whether the right in question was clearly established at the time of the violation." *Sloley v. Vanbramer*, No. 16-4213, 2019 WL 6765762, at *4, 2019 U.S. App. LEXIS 36733, at *11 (2d Cir. Dec. 12, 2019) (quoting *Tolan v. Cotton*, 572 U.S. 650, 655–56 (2014) (per curiam)). The Court has discretion to decide which of the two prongs to address first. *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)). Under either prong of the qualified immunity analysis, the Court "may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Tolan*, 572 U.S. at 656. Qualified immunity "is an affirmative defense on which [Defendants have] the burden of proof." *Outlaw v. City of Hartford*, 884 F.3d 351, 367 (2d Cir. 2018).

The Court has dismissed Plaintiff's § 1983 equal protection sex discrimination claim, and therefore whether Defendants have qualified immunity is moot. The Court does not consider whether Defendants are entitled to qualified immunity for Plaintiff's equal protection retaliation claim because Defendants failed to address this claim in their motion for summary judgment and reply. (*See* Dkt. Nos. 62-24, 79-3).[39] Given that qualified immunity is an affirmative defense, the Court finds that Defendants have not carried their burden. *See McCardle v. Haddad*, 131 F.3d 43, 51 (2d Cir. 1997) ("The qualified immunity defense can be waived, either by failure to raise it in a timely fashion, or by failure to raise it with sufficient particularity.").

---

[39] The Court notes that Defendants argue that they are entitled to qualified immunity because Plaintiff "was subjected to employment actions for the legitimate, nondiscriminatory, and nonretaliatory reasons." (Dkt. No. 62-24, at 49). However, Defendants only discuss retaliation under the First Amendment in their motion for summary judgment and reply. (*See id.*; Dkt. No. 79-3). As such, the Court does not construe their qualified immunity argument as applying to Plaintiff's equal protection retaliation claim. The Court notes that Defendants have also not addressed the applicable standard which considers the facts in the light most favorable to Plaintiff. *Sloley*, 2019 WL 6765762, at *4, 2019 U.S. App. LEXIS 36733, at *11.

### C.    New York State Law Claims

#### 1.    Claims Against OCFS

Plaintiff alleges Defendants violated the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 296 *et seq.*, by subjecting him to discrimination and retaliation. (Dkt. No. 1, ¶¶ 63, 65). Defendants argue that Plaintiff's claims against OCFS are barred by the Eleventh Amendment and sovereign immunity. (Dkt. No. 62-24, at 49).

Sovereign immunity shields state agencies from being sued in federal court on NYSHRL claims without their consent. *See Popat v. Levy*, 328 F. Supp. 3d 106, 134 (W.D.N.Y. 2018) (collecting cases holding that the NYSHRL does not waive New York's sovereign immunity from suit in federal court); *see also Leon v. Rockland Psychiatric Ctr.*, 232 F. Supp. 3d 420, 429, 430 (S.D.N.Y. 2017) ("[U]nder the doctrine of sovereign immunity, an individual may not sue a state, its agencies, or its officials in federal court, absent that state's consent or an express statutory waiver of immunity."). Accordingly, the Court dismisses Plaintiff's NYHRL claims against OCFS.

#### 2.    Claims against Individual Defendants

Plaintiff alleges that the Individual Defendants aided and abetted OCFS in discriminating and retaliating against him, in violation of NYSHRL § 296(6). "By its terms, § 296(6) of the Human Rights Law creates a 'broad[ ] source of personal liability' that is not limited to employers or employees." *Stanley v. Guardian Sec. Servs., Inc.*, 800 F. Supp. 2d 550, 557 (S.D.N.Y. 2011); *see also Feingold v. New York*, 366 F.3d 138, 157 (2d Cir. 2004). In the Second Circuit, individuals can be held liable as aiders and abettors when they "actually participate[d] in the conduct giving rise to a discrimination claim." *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1317 (2d Cir. 1995), *abrogated on other grounds by Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 118 (1998).

"Claims of discrimination . . . under the NYSHRL are analyzed based on the same standard as claims under Title VII." *Powell v. Delta Airlines*, 145 F. Supp. 3d 189, 201 (E.D.N.Y. 2015); *see also Vargas v. Morgan Stanley*, 438 F. App'x 7, 9 (2d Cir. 2011) (using the same standard to analyze Title VII and NYSHRL discrimination claims). The same is true for claims of retaliation. *Matthews v. Corning Inc.*, 77 F. Supp. 3d 275, 295 (W.D.N.Y. 2014) ("Generally, the same analysis applies to retaliation claims made under the NYSHRL and Title VII."). Accordingly, for the reasons articulated *supra* Sections IV.A.3 and IV.B.1, the Court grants summary judgment to the Individual Defendants on Plaintiff's NYSHRL discrimination claim. Additionally, the Court dismisses the retaliation claims described *supra* Section IV.B.2. The Court denies summary judgment on the remaining retaliation claims.[40]

### D.    Whistleblower Retaliation Claim

Defendants argue that Plaintiff's whistleblower claim should be dismissed because (1) "the complaint fails to allege the statute upon which this claim is based," (Dkt. No. 62-24, at 51), and (2) "the Eleventh Amendment bars the bringing of state claims against OCFS and defendants Mallick, Judge, Moreno, and Lucky in their official capacities." (*Id.*). Plaintiff failed to respond to this argument. As such, the Court deems Plaintiff's whistleblower claim abandoned. *See Jackson v. Fed. Exp.*, 766 F.3d 189, 195 (2d Cir. 2014) ("[A] partial response arguing that summary judgment should be denied as to some claims while not mentioning others may be deemed an abandonment of the unmentioned claims."); *see also Kovaco v. Rockbestos-Surprenant Cable Corp.*, 834 F.3d 128, 144 (2d Cir. 2016) (inferring from plaintiff's "failure to

---

[40] As with Plaintiff's equal protection retaliation claim, Defendants have not addressed the liability of individual defendants. As such, there is no basis to dismiss the remaining retaliation claims under NYSHRL § 296(6) against Mallick, Judge, Moreno, and Lucky.

mention" claims that "he had abandoned them" where the defendant moved for summary judgment on all claims and the plaintiff "opposed the motion with respect to all but" one claim).

## V.    CONCLUSION

For these reasons, it is hereby

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 62) is **GRANTED in part** and **DENIED in part**; and it is further

**ORDERED** that all claims from the Complaint (Dkt. No. 1) are **DISMISSED with prejudice** with the exception of the Title VII retaliation claim against OCFS, the § 1983 Equal Protection retaliation claim against the Individual Defendants, and the NYSHRL retaliation claim against the Individual Defendants, which may proceed to trial only insofar as they are based on the iPad, time sheet, razor, and EpiPen investigations, the 2015 and 2016 performance evaluations, and the unit inspection and excessive scrutiny.

**IT IS SO ORDERED.**

Dated: January 9, 2020
       Syracuse, New York

Brenda K. Sannes
U.S. District Judge